985 P.2d 328 (1999)
139 Wash.2d 81
In the Matter of the DISCIPLINARY PROCEEDINGS AGAINST Arthur H. BOELTER, Attorney at Law.
No. 09213-3.
Supreme Court of Washington, En Banc.
Argued June 24, 1999.
Decided October 7, 1999.
*331 Kurt M. Bulmer, Seattle, for Petitioner.
Joanne S. Abelson, Washington State Bar Association, Seattle, for Respondent. *329
*330 ALEXANDER, J.
Attorney Arthur H. Boelter appeals the Washington State Bar Association (WSBA) Disciplinary Board's recommendation to this court that he receive a six-month suspension from the practice of law due to three counts of misconduct. The alleged misconduct arose out of a fee dispute between Boelter and a client, Robert Withey. The Board found that Boelter threatened to reveal Withey's confidences in a suit to collect fees and falsely claimed that a disclosable tape recording of a conference with Withey existed. It also found that the amount Withey was billed for the legal services was unreasonable. Boelter contends that a clear preponderance of the evidence does not support the findings of misconduct, and that the aggravating and mitigating factors were not properly weighed in determining his sanction.

FACTS
Boelter was admitted to practice in Washington in 1979. At the time of the alleged misconduct he was a principal in the Seattle law firm of Boelter, Silver and Gale, a firm that was known for a portion of the time material to this appeal as Boelter and Gale. Boelter was hired by Withey in 1990 to represent him before the Internal Revenue Service (IRS) in a tax dispute. During their initial conference, which occurred in August 1990, Withey revealed confidential information to Boelter regarding his past dealings with the IRS, including information that led Boelter "to conclude that Withey had concealed assets from the IRS and a bank." Clerk's Papers (CP) at 119. Boelter and Withey discussed payment of fees at this meeting. Boelter requested, and Withey paid in two installments, an $800 advance fee deposit which was deposited in the firm's trust account. Withey also received a pamphlet entitled "Boelter, Silver & Gale Attorneys at Law Terms of Engagement." Ex. 1; see also Report of Proceedings (RP) at 26.
Most of the legal work for Withey was performed by two associate attorneys at Boelter's law firm, Deborah Lyons and John White. The law firm did no substantive legal work for Withey after November 1990. At that time a balance of fees was owing. In January and September of 1991, Boelter directed White to write letters to Withey in an effort to collect the unpaid fees. On October 8, 1991, Boelter wrote a letter to Withey that is at issue here. The letter alleged that Withey owed $1,824.33 for legal services performed and it warned that
if we are not paid in full by October 15, 1991, we will file suit for the fees. You should understand that if we are forced to file suit, you forgo the attorney-client privilege and I would be forced to reveal that you lied on your statements to the IRS and to the bank as to your financial condition. This would entail disclosure of the tapes of our conversations about your hidden assets. There is a federal statute 18 U.S.C. § 1001 which provides for up to one year in jail for such perjury. The choice is yours.
Ex. 4; see CP at 119-20. Following receipt of this letter, Withey formed an opinion that Boelter had a tape recording of their August 1990 conversation, and believed that Boelter would reveal confidential information about Withey's financial condition and assets *332 if Withey did not pay his bill. Boelter followed this letter with a handwritten "speedmemo" dated November 15, 1991, confirming a telephone conversation with Withey. At the bottom it read that "[a] copy of this letter is also being sent by certified mail. Our preparations to file suit have begun. I would suggest that you liquidate one of the undisclosed art works you have & pay us by Nov. 25, 1991[.] Your choice[.]" Ex. 5.
In January 1992 Boelter and Withey reached a verbal understanding concerning settlement of Withey's account, and Boelter confirmed the agreement in a January 3, 1992, letter to Withey. Withey thereafter made a $400 payment to Boelter's firm, but failed to make the other payments outlined in the letter.
On March 3, 1992, at Boelter's behest, Boelter's associate, White, filed suit in Snohomish County District Court against Withey and Withey's wife. Withey's attorney, Harry Platis, then contacted White and told him
that he had received $1,803.97 from Withey and had placed it in his trust account, and that he was authorized to pay those funds to Respondent [Boelter] upon return of the tape recordings of Respondent's conference with Withey and on condition that Respondent give Withey all of his files and retain no copies.
CP at 121 (citation omitted); see also Ex. 70. White told Platis that he did not know of any tape recordings, and had not seen either the October 8, 1991, letter or the lower portion of the November 15, 1991, "speed-memo" in the file Boelter had given to him.
Concerned over the legal and ethical consequences of what appeared to be threats to Withey, White spoke with another associate who showed White a tape in Boelter's "desk drawer with the name `Withey' written on a `post-it' note attached to the tape." CP at 122. When White shared his concerns with Boelter, Boelter "clearly implied that a tape of his August 17, 1990 conversation with Withey had existed but that it had been erased." CP at 126. Boelter "told White that the tape no longer existed" and showed him that the tape was no longer in the desk drawer. CP at 122. White informed Platis of what he had learned, and Platis then indicated that a signed affidavit from Boelter attesting to "the fact that there was no longer a tape" would be acceptable. CP at 122. White prepared an affidavit at Boelter's request and Boelter signed it, with White notarizing his signature. In his affidavit, Boelter averred that "a tape recorded record was made" of Boelter's conversations with Withey and that the "tape has been erased and no transcript or copy of the original tape exists." Ex. 9. Relying upon this document, White wrote a letter to Platis on March 25, 1992, to confirm that the lawsuit was ready for settlement. Prior to consummating this agreement, Withey filed the grievance with the WSBA that is at issue here. The collection lawsuit against Withey did, however, proceed and was eventually settled in October 1993, upon Withey's payment to Boelter of $1,300.
In an April 1992 letter to Boelter, the WSBA requested a response to Withey's grievance. Boelter's response was filed in letter form with the WSBA in May 1992. In it he stated that the conference with Withey was not, in fact, tape-recorded and that the October 8, 1991, letter referred to dictation tapes. The letter did not mention the affidavit upon which the settlement negotiations between White and Platis had been predicated. Three years passed before the WSBA again wrote Boelter soliciting information concerning the grievance. During that interval Boelter asked White to destroy the affidavit he had signed in 1992. White refused to do so. White did, however, return the Withey file to Boelter at Boelter's request. Two other associates in Boelter's law firm subsequently made a copy of the affidavit and submitted it to the WSBA..
In February 1997, The WSBA formally charged Boelter with eight counts of misconduct, alleging violations of the Rules of Professional Conduct (RPC). A three-day hearing was thereafter held before Hearing Officer Fred Butterworth in April 1997. In addition to the alleged impropriety of the methods Boelter used in trying to collect the fees owed by Withey, the WSBA claimed that the fees charged to Withey were unreasonable. Its audit manager testified in support of this allegation and indicated that had *333 various unauthorized and unreasonable fees not been added to Withey's account, and had Withey's $800 advance fee deposit been credited in a manner consistent with the "Terms of Engagement" pamphlet, only $186.48 would have been owed by Withey as of March 3, 1992-not the $1,803.97 for which the lawsuit was maintained.
In August 1997 the hearing officer filed his extensive "Findings of Fact, Conclusions of Law and Hearing Officer's Recommendation" with the Disciplinary Board, finding that three counts of misconduct had been proven by "a clear preponderance of the evidence." See CP 115-50. Count I was that Boelter "engaged in conduct in violation of RPC 8.4(c), because the letter contained materially false and misleading information intended to obtain payment of earned and unpaid fees from Withey." CP at 137. Count IV was based on Boelter, in violation of RPC 8.4(c), falsely "stating [in] the October 8, 1991 letter to Withey that a tape did exist, and stating to White in the course of representation in the lawsuit that there had been a tape recording, but that it had been destroyed." CP at 137-38. Count VII was that Boelter's "conduct in adding certain unauthorized costs and expenses to Withey's monthly billing statements and charging certain excessive or unauthorized fees, violated RPC 1.5." CP at 138. The hearing examiner accepted as fact the WSBA's determination that the amount owed by Withey at the time the collection lawsuit was filed was $186.48, and not $1,803.97. The hearing examiner recommended the following sanctions: "On Counts I and IV the conduct of the lawyer warrants a 90 day suspension from the practice of law and Count VII restitution of the fees paid by Mr. Withey plus any fees Mr. Withey paid to Harry Platis." CP at 140.
In December 1997, by a 6-5 decision, the Board approved the examiner's findings and recommendation that Boelter pay restitution, but recommended an increased sanction of six months suspension on the basis that "the increased sanction is more appropriate to the misconduct found by the Hearing Officer." CP at 152. The five dissenters would have adopted the hearing officer's recommended sanction. This appeal followed pursuant to Rules 7.1(a) and 7.2 of the Rules of Lawyer Discipline (RLD).

ISSUES PRESENTED
I. Were the charges against Boelter proven by a clear preponderance of the evidence?
II. Should this court approve the sanctions recommended by the Disciplinary Board?

ANALYSIS

I.
The first issue that we are presented with is whether the charges against Boelter were proven by a clear preponderance of the evidence. Boelter contests all three counts that were found by the hearing examiner and adopted by the Board. Pursuant to Rule 4.11(b) of the Rules of Lawyer Discipline, disciplinary counsel must establish the acts of misconduct in bar discipline cases by a clear preponderance of the evidence. This "standard of proof is somewhat lower than the beyond reasonable doubt standard required in criminal prosecutions." In re Discipline of Allotta, 109 Wash.2d 787, 792, 748 P.2d 628 (1988). In cases where a hearing examiner's findings of fact are "supported by a clear preponderance of the evidence," we will not disturb them. In re Discipline of McMullen, 127 Wash.2d 150, 162, 896 P.2d 1281 (1995) (citations omitted). Nor will we ordinarily disturb even those findings of fact made upon conflicting evidence. In re Discipline of Huddleston, 137 Wash.2d 560, 568, 974 P.2d 325 (1999) (citing In re Discipline of Miller, 95 Wash.2d 453, 457, 625 P.2d 701 (1981)). Furthermore, this court is not to "substitute its own evaluation of the credibility of witnesses over that of the hearing examiner." In re Discipline of Dann, 136 Wash.2d 67, 77, 960 P.2d 416 (1998) (citing McMullen, 127 Wash.2d at 162, 896 P.2d 1281). Finally, "challenges to the hearing examiner's conclusions of law will fail if these conclusions are supported by the findings of fact." In re Discipline of Felice, 112 Wash.2d 520, 525, 772 P.2d 505 (1989) (citing *334 In re Discipline of Selden, 107 Wash.2d 246, 252, 728 P.2d 1036 (1986)).

A.
Boelter contests the finding that he committed the first and fourth counts, which allege that he violated RPC 8.4(c) in his October 1991 letter to Withey. That rule provides that "[i]t is professional misconduct for a lawyer to ... [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." These two counts are inextricably intertwined, although they do allege separate misrepresentations. The letter, again in relevant part, read as follows:
[I]f we are not paid in full by October 15, 1991, we will file suit for the fees. You should understand that if we are forced to file suit, you forgo the attorney-client privilege and I would be forced to reveal that you lied on your statements to the IRS and to the bank as to your financial condition. This would entail disclosure of the tapes of our conversations about your hidden assets. There is a federal statute 18 U.S.C. § 1001 which provides for up to one year in jail for such perjury. The choice is yours.
Ex. 4; see CP at 80-81, 119-20.
The WSBA alleges that this letter misrepresents the applicability of an exception to the protection of attorney-client confidentiality that is guaranteed by RPC 1.6. RPC 1.6(a) provides that "[a] lawyer shall not reveal confidences or secrets relating to representation of a client ... except as stated in sections (b) and (c)." (Emphasis added.) Under the relevant exception, "[a] lawyer may reveal such confidences or secrets to the extent the lawyer reasonably believes necessary... [t]o establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client." RPC 1.6(b)(2) (emphasis added). Accordingly, Boelter would have been able to reveal Withey's confidences or secrets in litigation to recover fees if he reasonably believed that disclosure to be necessary. However, he would certainly not, as he claimed in his October 1991 letter to Withey, have been "forced to reveal that you lied on your statements to the IRS and to the bank as to your financial condition."[1] Ex. 4 (emphasis added). It is a leap in logic even to claim that such a disclosure could reasonably be made voluntarily, for even that claim necessarily assumes that Withey would raise inability to pay as a defense to this hypothetical lawsuit. Boelter admits that he made this assumption. We see a couple of problems with this. First, inability to pay is not a valid defense to an entry of a judgment, and thus it seems unlikely that Withey would have offered it. Second, and more important, Boelter failed to consider Withey's other defenses in their fee dispute, including a defense that he could have readily anticipated: principally, the argument that Withey was grievously overcharged by almost 1,000 percent. Implicit in the RPC 1.6(b)(2) exception to the attorney-client privilege is that it should not be carelessly invoked. Yet Boelter's letter creates the following impression: (1) full payment, on terms dictated by Boelter, must be received in one week or (2) Boelter will be forced to reveal Withey's confessed crimes.
Boelter admitted in his May 1992 response to Withey's WSBA grievance that his October 1991 letter was "poorly drafted," and "that the phrasing of my statement could have been better." Ex. 12 at 2. He claims that his warning was based upon the supposition that "Withey would say that he did not have any assets to pay the bill[,]" and he was merely "giving fair warning to Mr. Withey of my intent to use information as authorized by RPC 1.6." Ex. 12 at 2. He wrote that "[i]n hindsight, I can see that I should have worded my entire letter of October 8, 1991 differently so that Mr. Withey would have better understood what I was saying about the permissible use of attorney/client confidences in a fee dispute." Ex. 12 at 3. In his testimony he addressed questions concerning this issue as follows:

*335 Q. You agree, do you not, that the letter... is an incomplete statement of what circumstances would permit you to make disclosures about client confidences or secrets?
A. Yes. It should have been fleshed out more.
Q. And do you also agree that the statement regarding any liability-or rather the implication that there is liability under that federal statute for perjury is somewhat incomplete?
A. Yes. The letter, again, should have been fleshed out.
RP at 500. Boelter would admit that his implication that Withey had violated 18 U.S.C. § 1001 was not researched. He characterized the letter, however, as being the product of concern for Withey, and not any desire to scare him into making payment.
The most innocuous interpretation of this language would be that it is unsolicited legal advice to Withey given in his best interest, warning him of the risk of his confidences being revealed in a legal dispute. This risk, avoidable through payment, is undeniable under RPC 1.6(b)(2). The letter, however, does not read that innocently. Moreover, the letter cannot be read uncoupled from the November 1991 "speed-memo." The hearing examiner found that this "was in continuation" of the misconduct inherent in the October letter. CP at 137. That second document, again, reads as follows: "Our preparations to file suit have begun. I would suggest that you liquidate one of the undisclosed art works you have & pay us by Nov. 25, 1991[.] Your choice[.]" Ex. 5. Going so far as to dictate the sale of an asset whose existence Boelter was aware of only through a client confidence reinforces the impression that he intended to convey a threata threat that closely resembles extortion.
Boelter asserts that under RPC 1.6 a lawyer should be able to "`threaten' a former client" with disclosure of client confidences in order to resolve a fee dispute. Opening Br. of Resp't Att'y at 16. We disagree. Even if we assumed that Boelter's outrageous position is correct, and the protections of RPC 1.6 are so readily subjugated by its permissive RPC 1.6(b)(2) exception, that would not excuse misrepresenting the applicability of that exception.[2]
This appearance of misrepresentation is further buttressed by the reference to the "tapes" in the October 1991 letter. Ex. 4. Even in his written defense, Boelter admits that
Neither I nor anyone in my office ever taped Mr. Withey, with or without his consent. I was upset when Mr. Withey thumbed his nose at us after I had done him a favor.... I had a vague sense that if we did have to sue him I would be able to use my dictation tapes ... (or their transcripts) to refresh my recollection and this would be very powerful evidence. Frankly, I didn't even know if the tapes still existed but I hoped to avoid the entire mess of a lawsuit and in doing so overstated my position.
... I should have left the reference to tapes completely out of the letter.
Ex. 12 at 2-3 (emphasis added). "[O]verstated my position" can be read as a polite substitute for "misrepresented." Boelter's testimony before the hearing examiner would attempt to excuse his October 1991 letter's reference to tapes as being "inartfully drawn. It's frankly sort of superfluous in the context of the letter." RP at 445. He "would guess" *336 that he was referring to a dictation tape, but admitted that these tapes were usually erased and reused after the dictation was transcribed. RP at 445.
Boelter's defenses to these counts do not ring true, and even he does not deny that misrepresentation occurred, although he characterizes it as unintended. SeeOpening Br. of Resp't Att'y at 19 ("Boelter agrees that the letter can be interpreted to mean that there is a verbatim recording of the August 17, 1990 meeting. However, such implication occurred as a result of negligence not intentional conduct.") (emphasis added).[3] Moreover, the hearing examiner found that Boelter compounded the misrepresentation when he made "statements to White about tape recording of his conversation with Withey, intending that White convey this information to Platis." CP at 135.
While the weight of other evidence appears sufficient to prove the charges, it seems also that Boelter's affidavit, although not introduced in the settled lawsuit, should qualify as a "statement." The hearing examiner, despite describing it as "a very difficult issue," found that "the WSBA has not convinced me that the affidavit should be given any standing in this proceeding." CP at 145, 147. This was so because the affidavit "was not `published' by respondent in any fashion, and it was personal as to him, that is, it was his statement and his signature." CP at 144 (emphasis added). In other words, a lie made in secret is not a lie.
A view less favorable to Boelter appears more persuasive. After all, Boelter had White prepare an affidavit in which he stated that "[i]n my meeting with Robert Withey ... a tape recorded record was made of the discussions." Ex. 9 (emphasis added). White notarized this affidavit upon Boelter's swearing to, and signing, it.[4] This active misrepresentation to White was much more than just an "implication," and the affidavit can be considered to rebut Boelter's somewhat snide complaint of a "non-existent duty to keep associates from reaching wrong conclusions from implications." Opening Br. of Resp't Att'y at 22. After all, we must now believe this affidavit to be an untruth, or at least another convenient "mistake," in light of Boelter's denying during the disciplinary proceeding that he taped his conversations with Withey. Moreover, on the basis of this "personal" affidavit, White wrote a letter to Platis confirming acceptance of the settlement offer, an acceptance predicated upon "an affidavit of Arthur H. Boelter regarding the tape recorded records of the discussions with Bob Withey." Ex. 8 (emphasis added). This was information that Platis would have been expected to convey to his client, Withey. Withey, in his subsequent complaint to the WSBA, would complain of Boelter's unauthorized taping of their conference. In light of the foregoing, we are unwilling to discount this affidavit on the basis that it is "unpublished" and "personal." Quite obviously, RPC 8.4(c) is always enforceable not just when violations of it occur in open court.
As noted earlier, we cannot substitute our own evaluation of the credibility of witnesses over that of the hearing examiner. Dann, 136 Wash.2d at 77, 960 P.2d 416. The hearing examiner based his conclusions upon his belief that Boelter's testimony was "difficult to accept" and "implausible." CP at 127, 128. There was no reviewable error in the hearing examiner's so deciding.

B.
As noted above, the hearing examiner also found, in Count VII, that Boelter violated RPC 1.5, which provides that "[a] lawyer's fee shall be reasonable." RPC 1.5(a). The relevant factor in a determination of reasonableness is "[w]hether the fee agreement or confirming writing demonstrates that the client had received a reasonable and fair disclosure of material elements *337 of the fee agreement and of the lawyer's billing practices." RPC 1.5(a)(8). Boelter does not dispute the hearing examiner's findings[5] that a number of fees and the manner of their handling were outside the terms of the fee agreement. Neither does he assign error to the finding that the proper billable amount was $186.48-not the $1,803.97 billed. Instead he simply questions the relevance of these findings. He relies upon two old cases that were decided under the Canons of Professional Ethics to argue that a fee dispute is outside the jurisdiction of the WSBA if the fees involved are "unreasonable" instead of "unconscionable." See Opening Br. of Resp't Att'y at 22-24 (citing In re Discipline of Fraser, 83 Wash.2d 884, 892, 523 P.2d 921 (1974); In re Discipline of Greer, 61 Wash.2d 741, 380 P.2d 482 (1963)). In Fraser we held that "[w]e are committed to the general rule that a disciplinary proceeding is not the proper forum in which to ... charge or retain attorney fees, unless it is shown that the amount charged or collected was unconscionable." Fraser, 83 Wash.2d at 892, 523 P.2d 921 (emphasis added). However, as the WSBA points out, the Canons he cites are part of a superseded code of legal ethics that not only preceded the current RPC but even preceded another, intervening code of legal ethics: the Code of Professional Responsibility.
The WSBA correctly observes that RPC 1.5 not only prohibits "`unconscionable'" fees, it requires that a lawyer's fees be "`reasonable.' " See Answering Br. of WSBA at 19. The WSBA argues that "[t]he court should explicitly overrule these old cases to make clear that the Association has jurisdiction to enforce all the RPC." Answering Br. of WSBA at 19. Indeed, it argues that we may already have overruled Fraser and Greer sub silentio in applying, and finding violations of, RPC 1.5 in In re Discipline of Heard, 136 Wash.2d 405, 416, 963 P.2d 818 (1998). We agree with the WSBA. We did not intend to engage in a useless act when we adopted RPC 1.5. See, e.g., 104 Wash.2d 1101 (1985) (adopting RPC and noting that "[t]he rules abrogated are the complete set of Code of Professional Responsibility."). To the extent that Fraser and Greer are inconsistent with RPC 1.5 they are now expressly disavowed.
Finally, Boelter makes the policy argument that "[t]he association and the Hearing Officer, after civil resolution of the dispute, now ... seek to unwind the settlement agreement voluntarily entered into by Withey and Boelter." Opening Br. of Resp't Att'y at 23. However, as we noted in Dann, even where clients tacitly approve of misconduct, "`[t]he disciplinary rules govern the conduct of lawyers; misconduct is not something other than misconduct when it is approved by others.' The injury is as much to the image of the legal profession as it is to the individual client." Dann, 136 Wash.2d at 79 n. 2, 960 P.2d 416 (quoting approvingly In re Complaint of Dinerman, 314 Or. 308, 840 P.2d 50, 55 (1992)).
In sum, for the reasons stated above, we uphold the hearing examiner's conclusions that Boelter committed three counts of misconduct, given that a clear preponderance of the evidence supported them.

II.
The second main issue that we are presented with is whether we should approve the sanctions recommended by the Disciplinary Board. Boelter asks for a reprimand, or certainly no more than the restoration of the 90-day suspension recommended by the hearing examiner.
We have no record of what supported the Board's decision to reject the recommendation of the hearing examiner and recommend a greater suspension other than its brief statement that "the increased sanction is more appropriate to the misconduct found by the Hearing Officer." CP at 152. We have previously noted that "[a]s the only body to hear the full range of disciplinary matters, the [Disciplinary] Board has the opportunity to develop unique experience and perspective in the administration of sanctions. *338 We should not lightly depart from recommendations shaped by this experience and perspective." In re Discipline of Noble, 100 Wash.2d 88, 94, 667 P.2d 608 (1983). Accordingly, we will adopt the Board's recommendation unless one or more of the following five Noble factors should clearly persuade us that the sanction recommended is inappropriate:
1. The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);
2. The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);
3. The effect of the sanction on the attorney (sanction must not be clearly excessive);
4. The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and,
5. The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).

In re Discipline of Johnson, 114 Wash.2d 737, 752, 790 P.2d 1227 (1990) (summarizing Noble, 100 Wash.2d at 95-96, 667 P.2d 608).
While we defer to the hearing examiner's fact-finding role, when it comes to sanctions "the conclusions of the Disciplinary Board ... are accorded greater weight than those of the hearing examiner." McMullen, 127 Wash.2d at 162, 896 P.2d 1281 (citing In re Discipline of Johnson, 118 Wash.2d 693, 703, 826 P.2d 186 (1992)). However, the converse of our statement that we "will hesitate to reject a unanimous recommendation [from the Disciplinary Board] in the absence of clear reasons for doing so" is that "[a] recommendation from which there is a dissent may well be more readily rejected." Noble, 100 Wash.2d at 96, 667 P.2d 608. "[T]he ultimate responsibility and authority for determining the nature of attorney discipline rests with this court." McMullen, 127 Wash.2d at 162, 896 P.2d 1281 (citing Johnson, 118 Wash.2d at 703, 826 P.2d 186). In meeting that responsibility, we are guided by the AMERICAN BAR ASS'N CTR. FOR PROFESSIONAL RESPONSIBILITY'S STANDARDS FOR IMPOSING LAWYER SANCTIONS (1986). See Dann, 136 Wash.2d at 77, 960 P.2d 416 (citing Johnson, 118 Wash.2d at 701, 826 P.2d 186). Under those STANDARDS, we engage in a two-stage process:
`First, we determine a presumptive sanction by considering (1) the ethical duty violated, (2) the lawyer's mental state and (3) the extent of the actual or potential harm caused by the misconduct. Then, we consider any aggravating or mitigating factors which may alter the presumptive sanction.' Johnson, 118 Wash.2d at 701, 826 P.2d 186 (citations omitted).
Dann, 136 Wash.2d at 77, 960 P.2d 416.
In examining the ethical duty violated,[6] we have made clear the importance of RPC 8.4(c): "Simply put, the question is whether the attorney lied. No ethical duty could be plainer." Dann, 136 Wash.2d at 77, 960 P.2d 416. After all, "[l]ying to clients is an assault upon the most fundamental tenets of attorney-client relations." Dann, 136 Wash.2d at 80, 960 P.2d 416. In another recent case involving an attorney's dishonesty, we wrote that "[l]awyers are expected `to exhibit the highest standards of honesty and integrity' and not to engage in dishonest, fraudulent or deceitful conduct." Huddleston, 137 Wash.2d at 573, 974 P.2d 325 (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS at 5 (1991)).[7] Accordingly, "`[t]he duty of this court is to protect the public from dishonest, deceitful lawyering.'" Dann, 136 Wash.2d at 87, 960 P.2d 416 (quoting In re Discipline of Vetter, 104 Wash.2d 779, 793, 711 P.2d 284 (1985)).
A lawyer's mental state in committing misconduct may consist of intent, knowledge, or negligence. See McMullen, *339 127 Wash.2d at 169, 896 P.2d 1281 (citing STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 3.0 & commentary, at 25 (1986)). "Intent is the most culpable mental state, and involves acting `with the conscious objective or purpose to accomplish a particular result.'" Huddleston, 137 Wash.2d at 574, 974 P.2d 325 (emphasis added) (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS at 6 (1991)). Boelter arguably violated RPC 8.4(c) with intent,[8] for which the greater penalty, disbarment, would be a possible sanction. See Huddleston, 137 Wash.2d at 575, 974 P.2d 325 ("[D]isbarment is appropriate when ... `a lawyer engages in.. intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.'") (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 5.1(b), at 36 (1991)). Significantly, the hearing examiner found that Boelter acted knowingly in his misconduct. We have written that "[a] lawyer violates the rules with knowledge when he or she has `the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result.'" McMullen, 127 Wash.2d at 169, 896 P.2d 1281 (emphasis added) (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS Definitions, at 7 (1986)). Boelter at least meets this standard. For example, quite apart from the misrepresentation of claiming that tapes had been made of his conference with Withey, Boelter admitted that in cavalierly threatening their disclosure "[f]rankly, I didn't even know if the tapes still existed."[9] Ex. 12 at 3 (emphasis added).
"`Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession and causes injury or potential injury to a client, the public, or the legal system.'" Dann, 136 Wash.2d at 80, 960 P.2d 416 (quoting STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 7.2, at 14 (1991)). Suspension involves the removal of an attorney from the practice of law for a specified minimum period of time, and generally should last for a period of time not less than six months and not greater than three years. See McMullen, 127 Wash.2d at 170, 896 P.2d 1281 (citing STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 2.3, at 8 (1986)).
As to injury, "[w]e give `particularly great weight' to the question of the extent of injury involved due to the attorney's misconduct." Dann, 136 Wash.2d at 79, 960 P.2d 416 (quoting In re Discipline of Curran, 115 Wash.2d 747, 772, 801 P.2d 962, 1 A.L.R.5TH 1183 (1990)). The hearing examiner wrote that "[t]here was injury to the client who not only overpaid for the services rendered, but was forced to hire other counsel to defend himself from the lawyer who was threatening to use confidential information against the client." CP at 140. He wrote that "[t]he legal system was injured as well in that a lawsuit [was] filed alleging a debt of $1,803.97 when the actual amount of the debt should have been $186.48." CP at 140. In light of these considerations, it appears that the presumptive sanction of a suspension is warranted.
Having determined that a suspension is warranted, we next turn to the aggravating and mitigating factors under the STANDARDS FOR IMPOSING LAWYER SANCTIONS stds. 9.22 and 9.32. See Johnson, 118 Wash.2d at 705-06, 826 P.2d 186 (listing factors). The hearing examiner found the following aggravating factors: (b) dishonest or selfish motive, (d) multiple offenses and (i) substantial experience in the practice of law. In determining the sanction for the three proven counts the hearing examiner, without explanation for the inconsistency, wrote that there was "no aggravation present." CP at 140. He did, though, find the following mitigating factors: (a) absence of a prior disciplinary record and *340 (i) delay in disciplinary proceeding-writing that "the delay in this matter was significant and inexcusable." CP at 136. In determining the sanctions the hearing examiner gave no indication that he applied the mitigating factor of an absence of a prior disciplinary record. Insofar as delay was involved, he determined that it "would best be recognized by an initial determination whether to proceed with the case or not to proceed." CP at 148. As a result, he wrote that he had "not factored into my decision the matter of the WSBA's delay in handling this matter. I'm not necessarily satisfied with that result, but am unable to figure out any other approach." CP at 149.
We have previously rejected the argument that delay in disciplinary proceedings, even that which stretches into years, necessarily warrants a reduction in recommended sanction. See Dann, 136 Wash.2d at 82, 960 P.2d 416 (limiting In re Discipline of Ressa, 94 Wash.2d 882, 621 P.2d 153 (1980)). Instead, it is to be "placed into context as but one mitigating factor to be balanced against a number of aggravating factors."[10]Dann, 136 Wash.2d at 82-83, 960 P.2d 416 (emphasis added). It seems to us that the unapplied aggravating and mitigating factors can be looked upon as canceling one another out, with concern over the delay being countered by the very close question of whether Boelter's conduct was intentionalwhich would elevate the sanction to a new level. Moreover, a sanction beyond restitution could quite readily be applied for a tenfold overbilling of Withey. The Board may have felt similarly in doubling the hearing officer's recommended sanction.
Boelter seeks to add mitigating factors, but we decline to add fact findings, based upon Boelter's bare assertions, to the evidence-supported record of the hearing examiner. Boelter also refers to this as "an isolated incident of dishonesty" and argues that "[w]here the misconduct occurred many years ago and has not recurred, a suspension will be excessive and punitive." Opening Br. of Resp't Att'y at 26, 29. However, "[e]nding misconduct does not erase ... that misconduct which has already occurred. Even where an attorney has been rehabilitated prior to the imposition of discipline, `the legal system itself has not been redeemed.'" Dann, 136 Wash.2d at 83-84, 960 P.2d 416 (quoting In re Discipline of Kennedy, 97 Wash.2d 719, 723, 649 P.2d 110 (1982)).
Finally, we can go through the formal, if somewhat redundant, process of assessing the five Noble factors enumerated above. The purposes of lawyer discipline would be served, as illustrated by the discussion above of the injury inflicted through an attorney's dishonesty and the fact that the public, and other attorneys, will be shown that a protection as fundamental as the attorney-client privilege cannot be undermined by dishonest threats to violate it (factor 1).
As for proportionality (factor 2), Boelter writes that "[i]t is clear that misrepresentation cases ... are not resulting in suspensions," and refers to stipulations to make his proportionality argument. Opening Br. of Resp't Att'y at 28. This is disingenuous argument at best. First, Boelter does not note that "stipulations are not precedents that bind this court, although they can be helpful." Dann, 136 Wash.2d at 85, 960 P.2d 416 (citing In re Discipline of Plumb, 126 Wash.2d 334, 343, 892 P.2d 739 (1995)). One can regard a lesser, stipulated sanction as being analogous to a plea bargainand just as irrelevant for purposes of attorney discipline as a plea bargain in another criminal case would be for sentencing purposes following a jury trial. Second, we need not turn to stipulations for help because clear precedent, *341 uncited by Boelter, belies Boelter's assertion that attorney misrepresentations do not result in suspension. Two recent decisions of ours involving noncriminal violations of RPC 8.4, Dann, 136 Wash.2d 67, 960 P.2d 416, and In re Discipline of Haskell, 136 Wash.2d 300, 962 P.2d 813 (1998), resulted in one-and two-year suspensions of the attorneys involved. Given Dann and Haskell, Boelter clearly misrepresents the precedent in this area. A six-month suspension seems appropriate so that the sanction does not "`depart significantly from sanctions imposed in similar cases.'" Johnson, 114 Wash.2d at 752, 790 P.2d 1227 (emphasis added; citation omitted).
Furthermore, a six-month suspension does not appear to be "`clearly excessive'" (factor 3). Johnson, 114 Wash.2d at 752, 790 P.2d 1227. Boelter argues that if suspended, his "practice will obviously be significantly impacted." Opening Br. of Resp't Att'y at 29. However, Boelter "does not offer any unique circumstances explaining why the hardship upon him would be undue. It is doubtful that the sanction would be affected even if he did." Dann, 136 Wash.2d at 87, 960 P.2d 416; see also Plumb, 126 Wash.2d at 344, 892 P.2d 739 ("The hardships in this case are real, but they do not render either suspension or disbarment `clearly excessive.'").
The sanction does not appear to have been "`based upon considerations not supported by the record'" (factor 4), Johnson, 114 Wash.2d at 752, 790 P.2d 1227, and, as noted above, a clear preponderance of the evidence supported the counts proven against Boelter.
There was no unanimity on the Disciplinary Board (factor 5), with six members favoring a six-month suspension and five wanting to adopt the hearing examiner's recommendation. However, the division on the Disciplinary Board provides no support for Boelter's position that a mere reprimand be administered. The Disciplinary Board was, after all, unanimous in agreeing that at least a 90-day suspension was warranted. Boelter writes that
[t]he decision to remove Boelter from the practice of law for six-months must be based [on] more than instinct. The [h]earing [o]fficer provided a rationale for his decision and this rationale was adopted by five of the eleven members of the Board. If one or the other suspension is to be imposed, the better reasoned suspension is the 90-day suspension.
Opening Br. of Resp't Att'y at 30. Intuitively this would make sense, if the Disciplinary Board were the final word in attorney discipline. Certainly, it would have been helpful if the Disciplinary Board had better articulated its reasons for diverging from the hearing examiner's recommendation. Its failure to do so could create the impression of arbitrariness in attorney discipline proceedings. While we are mindful that the Disciplinary Board is a volunteer body, acting only under a delegation of authority from this court, we would refer it for purposes of future cases to RLD 6.7(f): "If the Board amends, modifies, or reverses any finding, conclusion or recommendation of the hearing officer or panel, the order of the Board shall set forth the reasons for its decision." (Emphasis added.)
However, any appearance of arbitrariness in this particular case is correctable through the fact that this court, as the ultimate arbiter of attorney discipline, is reviewing it. As noted earlier, "the ultimate responsibility and authority for determining the nature of attorney discipline rests with this court." McMullen, 127 Wash.2d at 162, 896 P.2d 1281. We can provide an opinion that remedies the shortcomings of the Disciplinary Board's recommendation and provides guidance to attorneys and the public. Moreover, as to the argument that the Disciplinary Board's close vote should influence us to side with its dissent in favoring a 90-day suspension, this does not necessarily follow. Dann noted that "[p]erhaps overlooked is the fact that an appeal of the Disciplinary Board's decision carries with it the chance that we might increase the recommended sanction instead of simply adopting or decreasing it." Dann, 136 Wash.2d at 84-85, 960 P.2d 416 (emphasis added) (citing In re Discipline of Lynch, 114 Wash.2d 598, 789 P.2d 752 (1990) (rejecting an appealed six-month suspension and imposing a two-year suspension instead); Selden, 107 Wash.2d 246, 728 P.2d 1036 (rejecting an appealed 60-day suspension and disbarring instead)). Thus, "[t]he familiar *342 expression, `It never hurts to ask,' is not necessarily true in attorney discipline cases." Dann, 136 Wash.2d at 85 n. 6, 960 P.2d 416.
After assessing the aggravating and mitigating factors, and noting the rule that suspensions generally "`should be for a period of time equal to or greater than six months[,]'" McMullen, 127 Wash.2d at 170, 896 P.2d 1281 (quoting approvingly STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 2.3, at 8 (1986)), we conclude that the six-month suspension here is easily supportable. Although the hearing examiner concluded otherwise, he did not articulate his reasons for deviating from this general rule and we are not inclined to do so under these facts.

CONCLUSION
Because Arthur Boelter "was upset when Mr. Withey thumbed his nose at us" by not paying fees owed, he wrote a letter to Withey misrepresenting the applicability of an exception to the protections of RPC 1.6. Ex. 12 at 2. He claimed that in a lawsuit to collect fees owed he would be "forced" to reveal that Withey had admitted, during a meeting between them, to having violated a law, even though Boelter had not researched the applicability of that law and even though such a disclosure would not have been forced. He claimed also that "[t]his would entail disclosure of the tapes of our conversations about your hidden assets." Ex. 4 (emphasis added). Even though he would later make the implausible claim that he must have been referring to dictation tapes, he admitted that he was not aware at the time of making the threat whether even those tapes existed. Moreover, in threatening to invoke an exception to RPC 1.6 in the first place he was ignoring the fact that Withey's failure to pay might be due, at least in part, to overbilling of a tenfold magnitude. This billing was certainly not "reasonable" under RPC 1.5, even though Boelter excuses it by claiming that it was not "unconscionable" and, thus, somehow outside the WSBA's jurisdiction. Boelter compounded his misrepresentation to Withey by misrepresenting to his own associate, John White, the existence of the supposed tape, a misrepresentation which White was expected to convey to Withey's attorney as part of the settlement of the fees dispute between Boelter and Withey. Boelter's misrepresentations cannot be dismissed as the product of negligence, as he would have us believe. We are satisfied, in sum, that the record in this case supports the counts proven against Arthur Boelter and the six-month suspension and restitution that is recommended to us by the Disciplinary Board.
GUY, C.J., SMITH, JOHNSON, MADSEN, TALMADGE, JJ., and ELLINGTON, J.P.T., concur.
NOTES
[1] No authority in support of this legal interpretation has been cited by Boelter, and for good reasonnone can be found. RCW 5.60.060(2)(a) provides that "[a]n attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment." (Emphasis added.)
[2] Withey was asked about his first meeting with Boelter:

"Q. Did Mr. Boelter tell you during that first meeting anything about what would happen with the information that you were telling him?
"A. No. I would assume that it would be between he and I."
RP at 27. For future guidance to attorneys, we would note that any expression of confidences by a client that can, potentially, be used against the client should be based upon an informed decision. That informed decision necessarily requires knowing about the exceptions to RPC 1.6. See RPC 1.4(b) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."). So that clients do not make the reasonable, if incorrect, assumption that their perhaps self-incriminating confidences are sacrosanct under all circumstances, it follows that an attorney should explain the exceptions to RPC 1.6 to his or her clients at the outset of representation.
[3] Later in his brief, however, Boelter, in asking for this court's mercy, admits that he "engaged in an isolated event of dishonesty in connection with one former client years ago when he wrote a collection letter to the former client containing misleading statements." Opening Br. of Resp't Att'y at 26 (emphasis added).
[4] Incidentally, White's act of notarizing the sworn affidavit was a statutory act. See RCW 42.44.080.
[5] Thus, these findings can "be accepted as verities." In re Discipline of Johnson, 118 Wash.2d 693, 701, 826 P.2d 186 (1992) (citing In re Discipline of Curran, 115 Wash.2d 747, 759, 801 P.2d 962, 1 A.L.R.5TH 1183 (1990)).
[6] It should be noted that the sanction of restitution for violating RPC 1.5 is unchallenged beyond Boelter's erroneous threshold argument that merely "unreasonable" billing is simply outside the jurisdiction of the WSBA.
[7] Curiously, Boelter makes no citation whatsoever to either of these two very recent RPC 8.4 cases.
[8] For example, the WSBA points to the fact that the hearing examiner's "findings and conclusions are internally inconsistent in that he found that Mr. Boelter acted `intentionally' in writing Mr. Withey the threatening letter, but he applied the mental state of `knowledge' in arriving at his recommended sanction." Answering Br. of WSBA at 38 n. 8; see CP 135 (hearing examiner writes that Boelter's "state of mind in making these material false statements was intentional.") (emphasis added).
[9] We could also consider the RPC 1.5 violation resulting from unreasonable billing of Withey.
[10] It can also be noted that in Dann "the hearing examiner did expressly take delay into consideration-and the Disciplinary Board may have taken it even more seriously, given its recommended halving of the suspension proposed by the hearing officer." Dann, 136 Wash.2d at 83, 960 P.2d 416. However, that was just our speculation as to what elements might have gone into those recommendations. A few key mitigating factors in Dann, not present here, would have been factored in: "`(d) timely good faith effort to make restitution or to rectify the consequences of some misconduct[,]'" "significant publicity" that qualified as "`(k) imposition of other penalty[,]'" and "`(l) remorse.'" Dann, 136 Wash.2d at 82, 960 P.2d 416 (citation omitted). Dann's showing of remorse was not very compelling, see Dann, 136 Wash.2d at 81, 960 P.2d 416, but at least, unlike Boelter, he showed some remorse.