FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KAM-KO BIO-PHARM TRADING CO.,
LTD-AUSTRALASIA, a Washington
Corporation,
            *Plaintiff-Appellant,*

            v.

MAYNE PHARMA (USA) INC., a
Delaware corporation; MAYNE
PHARMA PTY, LTD, an Australia
corporation (now known as Mayne
Pharma Ltd.); MAYNE GROUP LTD,
an Australian public company;
DAVID BULL LABORATORIES, an
Australian proprietary company;
and John Does 1-12,
            *Defendants-Appellees.*

No. 07-35449

D.C. No.
CV-06-00840-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, District Judge, Presiding

Argued and Submitted
January 22, 2009—Seattle, Washington

Filed March 11, 2009

Before: Robert R. Beezer, Richard C. Tallman, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## COUNSEL

Shaunta Marie Knibb & Jeff A. Smyth, Smyth & Mason, PLLC, Seattle, Washington for the plaintiff-appellant.

Alan S. Middleton, Davis Wright Tremaine LLP, Seattle, Washington for the defendants-appellees.

## OPINION

MILAN D. SMITH, JR., Circuit Judge:

Plaintiff-Appellant Kam-Ko Bio-Pharm Trading Co., Ltd-Australasia (Kam-Ko) successfully sued Defendants-

Appellees Mayne Pharma (USA) Inc. (Mayne) in district court to compel arbitration before the International Chamber of Commerce (ICC). A short time later, however, Kam-Ko filed a new lawsuit in district court seeking a declaration that the ICC's $220,000 advance arbitration fee was so high as to be substantively unconscionable under the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1-16, and Washington law. The district court rejected Kam-Ko's argument and, when the parties failed to comply with its directive to proceed with arbitration within sixty days, dismissed Kam-Ko's declaratory relief action with prejudice. Given the entirely commercial nature of this dispute, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Royalty Agreement

Kam-Ko is a Washington company that assisted other companies in securing distribution deals in the Pacific Rim for anti-cancer drugs produced by NaPro BioTherapeutics, Inc. (NaPro). Kam-Ko provided its services to help Mayne's alleged predecessor-in-interest obtain a distribution deal with NaPro in exchange for an agreement (Royalty Agreement) that required an up-front payment of $50,000 and a seventeen-year royalty equal to 5% of the bulk price paid to NaPro. During contract negotiations, Kam-Ko proposed a process for dispute resolution, and its draft language was included, unaltered, as paragraph six of the Royalty Agreement:

> **Disputes.** Any disputes will be settled by binding arbitration under an outside committee of three attorneys acceptable to both parties, under terms of International Chamber of Commerce arbitration guidelines, in Vancouver, B.C., Canada, should such dispute not be resolved within 30 days between the parties. The losing party will pay the cost of such arbitration.

### B. Disputed Termination of Royalty Agreement and Kam-Ko's Subsequent Action to Compel Arbitration

In December 2003, Mayne informed Kam-Ko that the Royalty Agreement was terminated because Mayne had purchased NaPro and believed this acquisition relieved Mayne of any obligations to continue making payments. Kam-Ko replied that the purchase did not relieve Mayne of its obligation to pay, and that if the parties were unable to reach an agreement on the matter within thirty days, Kam-Ko would seek to compel arbitration under paragraph six of the Royalty Agreement. Mayne did not reply, and Kam-Ko filed suit in the district court to compel arbitration. Pursuant to a stipulated order, the district court ordered the dispute referred to the ICC for arbitration and dismissed the case without prejudice.

### C. Proceedings Before the ICC

Kam-Ko filed a request for arbitration with the ICC in July 2005. Upon submission of the request, the ICC required Kam-Ko to pay a $2500 non-refundable deposit. The ICC then required a provisional advance from Kam-Ko of $45,000 with credit for the previously paid $2500. After some delay, Kam-Ko's principals personally loaned the company the money to pay the balance due. The ICC confirmed the parties' choices of one arbitrator each, appointed a third arbitrator to act as chairman of the tribunal, and set the advance costs at $220,000 to be split by Kam-Ko and Mayne, with credit to Kam-Ko for the amount it had previously paid.

Kam-Ko objected to the $220,000 amount as "confiscatory and punitive," and as "wholly unforeseeable to the parties." Mayne also objected to the amount, saying it "appears excessive and is unduly burdensome to both parties." Neither party submitted further payment to the ICC. Under the ICC rules, for the arbitration to proceed, Kam-Ko, as the claimant, was required to pay the entire amount due, or some form of secur-

ity in lieu of cash, if Mayne did not pay. After a number of extensions of payment deadlines, the ICC deemed the arbitration withdrawn. The ICC fixed the costs already incurred in the arbitration at $40,053, deducted that amount from Kam-Ko's payments of $45,000, and refunded $4947 to Kam-Ko.

## D.   Declaratory Relief Action

Kam-Ko then returned to the district court, seeking (1) "a declaration that the arbitration provision of the Royalty Agreement is illegal and unenforceable"; (2) "an order reforming the Royalty Agreement by severing the arbitration clause"; and (3) damages for Mayne's alleged breach of the Royalty Agreement.

In a subsequent, self-styled "motion for declaratory judgment," Kam-Ko requested a "speedy declaratory judgment hearing pursuant to Rule 57, Fed. R. Civ. P.," and argued that the arbitration clause was substantively unconscionable because of the alleged unreasonable financial burden it placed on Kam-Ko as a precondition to arbitration. To support its position, Kam-Ko offered sworn testimony that it would be unable to pay the arbitration fee and proceed with its claims if the district court enforced the arbitration clause. Mayne responded by asserting that Kam-Ko's motion was actually a motion for summary judgment because the motion sought to skip a hearing and obtain a merits ruling on the issue of unconscionability. Mayne also asked the district court to stay the action pending arbitration in accordance with the Royalty Agreement.

The district court denied Kam-Ko's declaratory judgment motion without reference to the request for a hearing, finding that "the arbitration clause is not void for substantive unconscionability." The district court also granted Mayne's request for a stay and directed the parties to proceed to arbitration within sixty days of the order. When the parties failed to proceed to arbitration as directed, the district court entered a stip-

ulated order dismissing Kam-Ko's declaratory judgment action with prejudice. Kam-Ko timely appealed.

## STANDARD OF REVIEW AND JURISDICTION

The validity of an arbitration clause is a question that we review de novo. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006) (en banc). Although Kam-Ko is correct that we review a district court's denial of declaratory relief under Rule 57 of the Federal Rules of Civil Procedure for abuse of discretion, *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005), as discussed below, the district court correctly construed and denied Kam-Ko's motion as a motion for summary judgment. "A grant of summary judgment is reviewed de novo." *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). We have jurisdiction over Kam-Ko's appeal pursuant to 28 U.S.C. § 1291.

## DISCUSSION

Kam-Ko argues that the district court erred in determining that the arbitration clause in the Royalty Agreement is not substantively unconscionable under the FAA and Washington law. Kam-Ko also asserts that the district court's ruling denied Kam-Ko's right to a jury trial, disregarded Kam-Ko's request for an evidentiary hearing, and "ignored" sworn testimony about Kam-Ko's alleged financial hardship.

### A.  Substantive Unconscionability

**[1]** Kam-Ko first argues that the costs required by the ICC render the arbitration clause in the Royalty Agreement substantively unconscionable. The FAA provides that "an agreement in writing to submit to arbitration an existing controversy arising out of . . . a contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Accordingly, while the Supreme Court has

emphasized that the FAA clearly enunciates a congressional intention to favor arbitration, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), "general contract defenses such as . . . unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements," *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (9th Cir. 2002).

**[2]** When a party seeks to have an arbitration agreement declared invalid on the basis of prohibitive expense, that party bears the burden of proving that the contract is unenforceable. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). In determining whether an arbitration clause is unenforceable, a federal court sitting in diversity must apply the relevant state law. *Nagrampa*, 469 F.3d at 1280. If the court finds that an arbitration clause is valid and enforceable, the court should stay or dismiss the action to allow the arbitration to proceed. *Id.* at 1276-77.

**[3]** In this case, because Kam-Ko filed its complaint in Washington and the Royalty Agreement contains no superceding choice-of-law provision, Washington law applies. *See Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 937 (9th Cir. 2001)*. Washington law recognizes two forms of unconscionability: substantive and procedural. *Adler v. Fred Lind Manor*, 103 P.3d 773, 781 (Wash. 2005). The only form at issue here, substantive unconscionability, "involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh. Shocking to the conscience, monstrously harsh, and exceedingly calloused are terms sometimes used to define substantive unconscionability." *Id.* (citations and internal quotation marks omitted). "When the courts use the expression 'unconscionable' in classifying a fee, we think they mean an amount under the circumstances which neither [party] can sensibly argue to be otherwise." *In re Disciplinary Proceeding Against Greer*, 380 P.2d 482, 487 (Wash. 1963), *overruled on other grounds by In re Disciplin-*

*ary Proceeding Against Boelter*, 985 P.2d 328, 337 (Wash. 1999).

**[4]** Under Washington law, "substantive unconscionability alone can support a finding of unconscionability." *Adler*, 103 P.3d at 782. Additionally, in a commercial context, the relevant clause must be substantively unconscionable at the time of contracting.[1] *M.A. Mortenson Co. v. Timberline Software Corp.*, 998 P.2d 305, 315 (Wash. 2000) ("In a purely commercial transaction . . . , the fact an unfortunate result occurs *after* the contracting process does not render an otherwise standard limitation of remedies clause substantively unconscionable."); *Adler*, 103 P.3d at 788 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 208 for the proposition that a court may refuse to enforce, reform, or limit the application of " 'a contract or term thereof [that] is unconscionable *at the time the contract is made*' " (emphasis added)).

**[5]** Here, the parties agreed to settle all disputes under the ICC's rules pursuant to an arbitration clause Kam-Ko itself originally proposed. Moreover, the record reveals that Kam-

---

[1]Kam-Ko cites *Zuver v. Airtouch Communications, Inc.*, 103 P.3d 753, 762-63 (Wash. 2004), for the proposition that the Washington Supreme Court has rejected the long-standing rule that courts must consider the substantive unconscionability of an agreement at the time the parties entered into the contract. Instead, Kam-Ko asserts, courts must now determine whether a contract clause is unconscionable on a case-by-case basis by analyzing "the context of the particular circumstances of the parties to the arbitration agreement." *Zuver*, however, was a case that dealt with the issue of whether high fees undermined the public policy favoring enforcement of *employment* discrimination claims, a policy that has no application in this purely *commercial* dispute. In addition, the *Zuver* court's unwillingness to judge the substantive unconscionability of the fee-splitting provision at the time the parties entered into the contract requires an understanding of the context: the employer had volunteered to pay the arbitration fee, and the court "refused to ignore [the] offer" in holding the unconscionability argument moot. *Id.* at 763 & n.7. Here, by contrast, Mayne refused to pay even its half of the arbitration fee, let alone the full amount.

Ko had in its possession a copy of the ICC's rules at the time it sought to compel arbitration. Appendix III, Article 4 of those rules includes tables of administrative expenses and of arbitrator fees. "For illustrative purposes only," these tables indicate "the resulting administrative expenses" and "the resulting range of fees" based on the sum in dispute. Kam-Ko's arbitration request sets the sum in dispute at $2,527,000 or more. This sum establishes administrative expenses of $23,800 plus 0.30% of the amount over $2,000,000, for a total here of $25,381. It similarly sets the maximum value for a single arbitrator at $81,000 plus 1.12% of the amount over $2,000,000, for a total of $86,902.40. Thus, for three arbitrators, expenses and fees amount to a maximum cost of $286,088.20. The ICC's advance fee for the arbitration in this case was $220,000, less than the maximum cost calculated using the tables.

[6] The record thus establishes that (1) Kam-Ko itself proposed paragraph six of the Royalty Agreement; (2) Kam-Ko effectively controlled the amount of arbitration expenses and fees by the sum it chose to claim in dispute and by the number of arbitrators it requested; and (3) the ICC rules Kam-Ko had in its possession before it sought to compel arbitration clearly indicated that arbitration expenses and fees might be as high as $286,088.20. Moreover, (4) Kam-Ko has failed to provide any evidence regarding what other arbitration fora would charge to conduct the arbitration it sought or the administrative expenses that the ICC would actually incur in arbitrating the matter; and (5) it is well known that "[i]n international commercial arbitrations, the fees of the arbitral tribunal can be considerable." John Y. Gotanda, *Setting Arbitration Fees: An International Survey*, 33 Vand. J. Transnat'l L. 779, 781 (2000) (noting, for example, that "a dispute involving $100 million and a panel of three arbitrators appointed under the Rules of the [ICC] could result in arbitrators' fees totaling $780,000"). In light of these facts, we fail to see how the requested $220,000 arbitration fee can fairly be characterized

as "one-sided," "[s]hocking to the conscience," or "monstrously harsh." *Adler*, 103 P.3d at 781.

Although Kam-Ko cites cases which hold that high arbitration costs can effectively deny a plaintiff access to a forum to obtain justice and thereby render an arbitration clause unconscionable, those cases are easily distinguishable, as they generally involve contracts of adhesion in either a consumer or employment context. *See, e.g.*, *Green Tree*, 531 U.S. 79 (consumer class action arising out of mobile home loan); *Luna v. Household Fin. Corp. III*, 236 F. Supp. 2d 1166 (W.D. Wash. 2002) (consumer action arising out of home loan); *Adler*, 103 P.3d 773 (discrimination action arising out of employment contract); *Zuver*, 103 P.3d 753 (same); *Nelson v. McGoldrick*, 896 P.2d 1258 (Wash. 1995) (consumer action arising out of unclaimed inheritance agreement); *Mendez v. Palm Harbor Homes, Inc.*, 45 P.3d 594 (Wash. Ct. App. 2002) (consumer action arising out of mobile home agreement). In this purely *commercial* case, no such consumer- or employment-based statutory rights or policies are at issue. Moreover, excluding the employment cases (where some courts have applied a categorical prohibition against requiring an employee to pay the arbitration fee), virtually all of the cases cited by Kam-Ko involve circumstances in which the potential arbitration expense dwarfs the amount claimed by an individual. By comparison, Kam-Ko's claim exceeds $2.5 million, thereby dwarfing its $110,000 share of the advance fee sought by the ICC.

Kam-Ko cites only one commercial case, *In re Arbitration Between Teleserve Sys., Inc. & MCI Telecommc'ns Corp.*, 230 A.D.2d 585 (N.Y. App. Div. 1997), in support of its substantive unconscionability argument. *Teleserve* has no precedential authority in our court and, even if it did, is readily distinguishable from the facts in this case. In *Teleserve*, the New York Supreme Court, Appellate Division, held that an arbitration fee of $204,000 was substantively unconscionable under both federal and state law. *Id.* at 593-94. The arbitration

agreement provided that all disputes arising out of a commercial contract involving telecommunications required arbitration pursuant to the rules of the Arbitration Association of America (AAA). *Id.* at 587. The court concluded that the "filing fee is patently excessive and bears no reasonable relation to the arbitration forum's administrative expenses in processing the claim. A filing fee of $204,000 far exceeds fees typically charged by neutral arbitration forums." *Id.* at 594.

Importantly, however, the parties in *Teleserve* had originally reached an agreement in which the arbitration fee was merely the flat fee of $4000 required by the AAA. *Id.* at 589. MCI then "unilaterally" drafted a new, superceding set of agreements—which incorporated an independent "MCI Tariff"—setting "a filing fee of $4,000 plus .5% of the amount claimed. Petitioner [was] thus . . . required to pay a filing fee of $204,000 based on its . . . claim [of] $40,000,000 in compensatory damages." *Id.* at 588-89.

Here, by contrast, the filing fee was not increased many times over that required by the arbitral forum by a separate "tariff" that grossly favored the party that proposed the arbitration clause. Rather, the ICC based its fees only upon the table of costs in the ICC rules to which Kam-Ko expressly agreed when it submitted its request for arbitration and set the sum in dispute at $2,527,000 or more.

**[7]** Accordingly, we hold that Kam-Ko has failed to meet its burden of showing that the arbitration clause in the Royalty Agreement is substantively unconscionable.

## B.   Right to Jury Trial

**[8]** Kam-Ko next argues that the district court's ruling denied Kam-Ko's right to a jury trial. However, in a declaratory relief action, as in other civil actions, a party has "an absolute right to a jury trial *unless a jury has been waived.*" *Pac. Indem. Co. v. McDonald*, 107 F.2d 446, 448 (9th Cir.

1939) (emphasis added). Here, the record shows that Kam-Ko waived its right to a jury trial in the parties' Joint Status Report and Discovery Plan, which states, "[n]o party has requested, or intends to request a jury as to any issue."

## C.    Request for Evidentiary Hearing

Kam-Ko also asserts that the district court erred by failing to hold an evidentiary hearing, as requested in Kam-Ko's declaratory judgment motion. Rule 57 of the Federal Rules of Civil Procedure provides, in relevant part:

> [The Federal Rules of Civil Procedure] govern the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201 . . . . The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. The court may order a speedy hearing of a declaratory-judgment action.

As a result, "the requirements of pleading and practice in actions for declaratory relief are exactly the same as in other civil actions." 10B WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2768 (3d ed. 1998).

This equivalence, in turn, means that:

> a party may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment. Insofar as plaintiffs seek a motion for a declaratory judgment, plaintiffs' motion is denied because such a motion is inconsistent with the Federal Rules. The only way plaintiffs' motion can be construed as being consistent with the Federal Rules is to construe it as a motion for summary judgment on an action for a declaratory judgment.

*Int'l Bhd. of Teamsters v. E. Conference of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995) (citation omitted). The dis-

trict court thus properly construed Kam-Ko's "motion" for declaratory judgment as a motion for summary judgment on Kam-Ko's "action" for declaratory judgment.

**[9]** In the absence of a genuine issue of material fact, summary judgment is appropriate without a trial, let alone an evidentiary hearing:

> [O]rdinarily there is no such thing as an evidentiary hearing . . . on a summary judgment motion. Under Federal Rule of Civil Procedure 56(c), a summary judgment may be granted if there is "no genuine issue as to any material fact," but not if there is a genuine issue. Where there is a genuine issue, trial rather than summary judgment is the means of determining what is true.

*Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir. 1997). Accordingly, because Kam-Ko failed to meet its burden of showing that the arbitration clause in the Royalty Agreement is substantively unconscionable under the FAA and Washington law, there was no genuine issue of material fact that would have required a trial or any kind of evidentiary hearing.

### D.   Sworn Testimony Regarding Financial Hardship

Finally, Kam-Ko contends that the district court erred by disregarding the declaration that Kam-Ko submitted regarding the company's alleged lack of assets and inability to pay the $220,000 arbitration fee. This argument fails for two reasons.

First, although Kam-Ko argues that the district court "ignored" its declaration regarding its alleged financial hardship, that assertion is factually incorrect. The district court explicitly noted in its order that "Kam-Ko represents to the Court that if the arbitration clause is enforced, it will be unable to proceed due to its inability to pay the arbitration fee," and then cited the declaration in support of that proposition.

**[10]** Second, as noted above, "[i]n a purely commercial transaction . . . , the fact an unfortunate result occurs *after* the contracting process does not render an otherwise standard limitation of remedies clause substantively unconscionable." *M.A. Mortenson Co.*, 998 P.2d at 315. Thus, the fact that Kam-Ko—a mere shell company that distributed many millions of dollars directly to its stakeholders—claims it is "unable to pay" many years after it proposed and agreed to the arbitration clause, does not create a genuine issue of material fact.

## CONCLUSION

In this purely commercial context, we hold that Kam-Ko has failed to meet its burden of showing that the costs of the ICC arbitration are so excessive as to be substantively unconscionable. Nor do we find that Kam-Ko was entitled to a jury trial or an evidentiary hearing, or that the district court failed properly to consider sworn testimony regarding Kam-Ko's alleged financial hardship.

**AFFIRMED.**