[Nos. 200,124-6; 200,131-9. En Banc.]
Argued May 10, 2005. Decided January 5, 2006.

*In the Matter of the Disciplinary Proceeding Against* JEFFREY G. POOLE, *an Attorney at Law.*

198

*Michael D. Hunsinger* (of *Hunsinger & Associates Sutkus & Kestle*) and *Christine Gray*, for the bar association.

*Catherine W. Smith* and *Devin T. Theriot-Orr* (of *Edwards, Sieh, Smith & Goodfriend, P.S.*) and *Kurt M. Bulmer*, for respondent.

¶1 BRIDGE, J. — On July 1, 2002, the Washington State Bar Association (Bar) filed a formal complaint against Jeffrey G. Poole seeking disbarment for alleged misconduct arising from his representation of grievant Joseph Matson. The complaint, in relevant part, charged Poole with mismanagement of his trust account and billing practices and alleged that he falsified documents. The hearing officer found that the Bar carried its burden on four of the six alleged counts of misconduct and recommended Poole be suspended for six months followed by two years probation and periodic audits of his trust account. The Washington State Bar Association Disciplinary Board (Board) affirmed the findings of fact and conclusions of law but, based on the finding of two additional aggravating factors, increased the suspension to one year. Poole and the Bar sought review, which was granted. We now affirm in part and reverse in part the Board's ruling and order Poole suspended for six months followed by two years probation and periodic audits of his trust account.

# I

## Facts and Procedural History

¶2 Poole was admitted to the Washington State Bar in 1986. He has been in private practice since that time and since 1993 or 1994 has been the sole principal of Poole & Associates. In August 1999, Matson, an independent construction equipment operator, retained Poole to pursue a claim against BFC Frontier, Inc. (BFC), for failure to pay for services Matson performed. Matson paid a $1,500 retainer and some small payments but was quickly unable to pay the mounting legal fees associated with the litigation. On December 17, 2000, trial against BFC commenced in Snohomish County Superior Court and on December 20, 2000, Poole sent Matson a statement reflecting an unpaid balance of $49,618.74. On December 21, 2000, the trial judge made an oral ruling in favor of Matson on most claims but deferred his ruling on attorney fees. BFC agreed to pay $27,675.35 in accord with the trial court's ruling. Both Poole and Matson testified they agreed the judgment award should be applied toward Matson's outstanding legal fees with Poole. BFC cut a check payable directly to Poole & Associates, and on January 2, 2001, it was deposited in the firm's general account. Inexplicably, the invoice dated February 15, 2001, and all subsequent invoices, failed to reflect the payment of $27,675.35 toward Matson's fees with Poole.

¶3 On February 9, 2001, the trial court awarded Matson $42,459.89 in attorney fees and costs, which BFC paid into Poole & Associates' trust account. By agreement between Poole and Matson, this amount was then disbursed from the trust account, with Matson receiving $20,000.00 and Poole & Associates receiving $22,459.89. While both amounts were debited from the trust account, the record reflects that the $20,000.00 amount provided to Matson, in addition to the $22,459.89, was erroneously credited against his amount owing to Poole. In sum, at this point, Poole's office failed to credit Matson's account with

$27,675.35 but erroneously credited his account with $20,000.00. The net result of this error was that from February 2001 onward, invoices sent to Matson reflected an amount owing of $7,675.35 in excess of the actual balance.

¶4 Beginning in February, the parties erroneously believed that Matson continued to owe Poole & Associates approximately $16,000 in legal fees. Hr'g Officer's Am. Findings of Fact, Conclusions of Law and Recommendations, Findings of Fact (FOF) 20; Ex. 11 (March 30 invoice reflecting balance owing of $15,927.75). However, the actual amount owing was $7,675.35 less, or approximately $8,200.00.

¶5 To satisfy the outstanding legal fees, Poole and Matson agreed that Matson would work off the remaining balance by performing trench work on a parcel of real property in Graham, Washington, owned by Poole's limited liability company (LLC). Poole testified that he believed the project should cost no more than $4,500, but he never conveyed that belief to Matson. Poole alleges he sent Matson a letter, dated February 19, 2001, memorializing the parties' agreements to date, to wit that $27,675.35 was applied to Matson's account, the division of the $42,459.89 award, that the balance due was around $16,000.00, and that Matson would perform trench work for Matson and in return, Poole would "write off the balance of [his] bill." Ex. 9. While the Bar alleged this letter was created by Poole in October and only in response to Matson's discontent, the hearing officer found that the Bar failed to meet its burden and that there was insufficient evidence to determine whether or not the letter was actually drafted and sent in February 2001. In April, Matson began work on the Graham property, which he completed in late May. In March and April 2001, Poole sent Matson invoices showing outstanding balances of approximately $16,000, with interest accruing.

¶6 In May 2001, with regard to a wholly separate matter, Matson met with an attorney representing a bonding company to whom he owed money. Matson and the attorney also

discussed Matson's outstanding balance with Poole and it was following this conversation that Matson began to claim that Poole was withholding a portion of his BFC judgment award. On May 25, 2001, Matson faxed Poole an invoice for the completed trench work for $26,547.98. Deducting the believed $16,094.43 balance owing and the $500.00 Poole had paid for gas, he alleged Poole owed him $9,953.55. He further alleged that Poole was wrongfully "holding the balance of the claim that was awarded to [him] (approx. [$]7500.00) against the rules of professional responsibility" and demanded the "balance of [his] Trust account" be returned to him. Ex. 14. The parties had a heated telephone conversation that day, and Poole responded by letter the same day asserting that the firm was holding no funds for Matson in its trust account. In that letter, Poole conflictingly stated (1) that because Matson had consulted with an attorney he would not communicate further with him without his written consent and (2) that he would be sending a second letter under separate cover addressing the dispute over the trench work invoice.

¶7 Shortly thereafter, Poole asserts that he sent Matson a letter and invoice, dated May 28, 2001, which allegedly conveyed that, in compliance with their agreement, he would "write of[f] [his] bill." Ex. 15. The Bar charged that these documents were fabricated in October 2001, backdated, and never sent to Matson in May. In spite of the Bar's contention, Matson testified at the hearing that he received the May 28 letter and invoice in May 2001. Nevertheless, while the hearing officer could not determine whether the letter was sent, she concluded that the invoice was neither prepared nor sent in May 2001.

¶8 On June 1, 2001, Matson recorded a mechanics' lien against Poole's LLC's Graham property for failure to pay for services performed. Poole, at the time, was hoping to sell a portion of this property to ameliorate his current financial troubles. On July 31, 2001, and again on October 1, 2001, Poole sent invoices to Matson for $16,717.00 and $17,044.61, respectively.

¶9 On October 2, 2001, Poole's LLC filed a motion for order to show cause to declare Matson's lien frivolous, asserting that Matson had been paid in full (by writing off the balance owing). Matson retained attorney Bryan Lee to respond to Poole's motion. Following a telephone conversation between Poole and Lee, Poole agreed that by Monday, October 8, he would provide Lee with documentation that Matson had approved of the BFC judgment disbursements and that Poole had written off the balance of Matson's account. During this process, Poole claims that mistakes were discovered that he attributed to his bookkeeper, Angela Robinson, whom he fired as a result. Specifically, he testified he discovered the failure to post the $27,675.35 credit and the erroneous credit of $20,000.00 to Matson's account.

¶10 On Monday, October 8, Poole faxed four documents to Lee without a cover letter or explanation. These documents included the February 19 letter, the May 25 letter, and the disputed May 28, 2001 letter and invoice. The "May 28" invoice indicated that the outstanding balance owed by Matson was $17,044.61, that a credit in this amount was applied, and the balance owing was zero.

¶11 Thereafter, Lee informed Poole that he had failed to credit the $7,675.35 from the BFC payment against Matson's bill to which Poole "immediately agreed." FOF 47. The next day, October 9, 2001, Lee and Poole entered into a written settlement agreement, establishing that Poole & Associates would pay Matson $8,439.16 ($7,675.35 plus interest) and $2,920.00 in attorney fees and costs by October 12, 2001. FOF 48. In exchange, Matson would release the lien against the property and both parties would mutually release each other of all claims. Poole testified that he intended to use the proceeds from the sale of some of his LLC's lots to make the payments, although conflicting evidence was submitted regarding whether the parties discussed this contingency. The anticipated sale of the LLC property did not occur in October or November, and in November 2001, a lender foreclosed on the deed of trust against the Graham property.

¶12 Following several extensions and requests for payment, on December 5, 2001, on behalf of Matson, Lee filed a lawsuit against Poole & Associates, Poole, and Poole's LLC. On December 19 and 20, 2001, Poole & Associates paid $7,675.35 plus interest to Matson. Following the judge's ruling in early April 2002 regarding attorney fees and costs, Poole & Associates paid Matson between $25,000 and $29,000 and Matson dismissed the lawsuit.

¶13 On July 1, 2002, the Bar filed a formal complaint against Poole alleging, in relevant part, the following four counts of professional misconduct:

### Count 1

. . . By backdating the May 28, 2001 invoice and/or presenting it to opposing counsel in the lien matter, [Poole] violated RPC 3.4(b) and/or RPC 8.4(c) . . . .

. . . .

### Count 4

. . . By failing to put Mr. Matson's judgment award of $27,675.35 in the BFC lawsuit into his client trust account, [Poole] violated RPC 1.14(a) . . . .

### Count 5

. . . By failing to account to Mr. Matson for the distribution of the BFC judgment award of $27,675.35, [Poole] violated RPC 1.14(b)(3) . . . .

### Count 6

. . . By failing to pay Mr. Matson the $7,675.35 of the BFC judgment award until December 2001, [Poole] violated RPC 1.14(b)(4) . . . .

Clerk's Papers (CP) at 7-8.

¶14 The hearing officer, Mary Wechsler, presided over the disciplinary hearing and concluded that the Bar proved the above four counts.[1] As to Poole's mental state, the hearing officer found that he acted knowingly and inten-

---

[1] The hearing officer found the Bar failed to prove counts 2 and 3, alleging Poole filed a false declaration in the lien dispute and made a misrepresentation in his Bar investigatory deposition. Additionally, the Bar voluntarily withdrew counts 7-10, which dealt with a separate matter.

tionally in committing count 1 and negligently in committing counts 4, 5, and 6. Decision Papers (DP) at 53-54, 57. Further, the hearing officer found three aggravating factors: (1) dishonest or selfish motive, (2) refusal to acknowledge wrongful nature of conduct, and (3) substantial experience in the practice of law. The hearing officer did not find any mitigating factors. Finding that the presumptive sanction for the most serious conduct established to be suspension, and that the lack of any mitigating sanctions "prohibit[ed] consideration of any less serious sanction," the hearing officer recommended a six-month suspension, followed by a two-year probation with periodic audits of his trust account. DP at 58.

¶15 The Board, by a 9-2 vote, adopted the hearing officer's findings of fact and conclusions of law with two modifications. The Board added two aggravating factors, "prior discipline" and "multiple offenses," and determined that these additions warranted increasing the sanction to a one-year suspension. DP at 41-42. One dissenting member considered disbarment appropriate, while the other, "due to the state of the record," preferred a reprimand. DP at 42 n.4.

II

Analysis

¶16 *Standard of Review*: This court exercises plenary authority in matters of attorney discipline. *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 593, 48 P.3d 311 (2002). We give considerable weight to the hearing officer's findings of fact, especially with regard to the credibility of witnesses, and we will uphold those findings so long as they are supported by "substantial evidence." *See In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 58, 93 P.3d 166 (2004) (citing ELC

11.12(b)).[2] "In reviewing these findings, we look at the entire record. However, 'we ordinarily will not disturb the findings of fact made upon conflicting evidence.'" *In re Disciplinary Proceeding Against Huddleston,* 137 Wn.2d 560, 568, 974 P.2d 325 (1999) (citation omitted) (quoting *In re Disciplinary Proceeding Against Miller,* 95 Wn.2d 453, 457, 625 P.2d 701 (1981)). In the end, the Bar has the ultimate "burden of establishing an act of misconduct by a *clear preponderance* of the evidence." *In re Disciplinary Proceeding Against Allotta,* 109 Wn.2d 787, 792, 748 P.2d 628 (1988). "'Clear preponderance' is an intermediate standard of proof . . . requiring greater certainty than 'simple preponderance' but not to the extent required under 'beyond [a] reasonable doubt'." *Id.* Thus, a clear preponderance of all the facts proved must support a finding of misconduct.[3]

■■ ¶17 We review conclusions of law de novo, which must be supported by the factual findings. *See Guarnero,* 152 Wn.2d at 59; *see also* ELC 11.12(b). In so doing, we give "'serious consideration'" to the Board's recommended sanc-

---

[2] "Substantial evidence exists if the record contains '"evidence in sufficient quantum to persuade a fair-minded, rational person of the truth of a declared premise."'" *In re Disciplinary Proceeding Against Bonet,* 144 Wn.2d 502, 511, 29 P.3d 1242 (2001) (quoting *In re Welfare of Snyder,* 85 Wn.2d 182, 185-86, 532 P.2d 278 (1975) (quoting *Helman v. Sacred Heart Hosp.,* 62 Wn.2d 136, 147, 381 P.2d 605 (1963))).

[3] The dissent submits that we apply the wrong standard of review in this case, asserting that we have "consistently" applied a clear preponderance standard in disciplinary cases instead of a substantial evidence standard. Dissent at 234. On the contrary, while many cases set forth a clear preponderance standard for reviewing a hearing officer's factual findings, still others review findings with a substantial evidence standard. *Compare In re Disciplinary Proceeding Against Lopez,* 153 Wn.2d 570, 582, 106 P.3d 221 (2005) (clear preponderance); *In re Disciplinary Proceeding Against Cohen,* 150 Wn.2d 744, 754, 82 P.3d 224 (2004) (clear preponderance); *In re Disciplinary Proceeding Against Dynan,* 152 Wn.2d 601, 607, 98 P.3d 444 (2004) (clear preponderance); *with Guarnero,* 152 Wn.2d at 58 (substantial evidence); *In re Disciplinary Proceeding Against Delaney,* 83 Wn.2d 415, 421, 518 P.2d 713 (1974) (substantial evidence).

And at least one case, which is cited by the dissent as employing the clear preponderance standard, makes use of *both* standards. *Huddleston,* 137 Wn.2d at 568 (claiming to apply the clear preponderance standard yet resting its holding on the fact that, "'substantial, albeit disputed, testimony' is sufficient to support challenged findings of fact" (quoting *In re Disciplinary Proceeding Against Denend,* 98 Wn.2d 699, 704, 657 P.2d 1379 (1983))). Thus, the applicable case law does not state a consistent rule, and the standard we articulate today neither departs from nor ignores the clear preponderance standard.

tion and generally affirm it " 'unless [the] court can articulate a specific reason to reject the recommendation.' " *Guarnero*, 152 Wn.2d at 59 (quoting *In re Disciplinary Proceeding Against McLeod*, 104 Wn.2d 859, 865, 711 P.2d 310 (1985)).

## Count 1: The May 28 Letter and Invoice

¶18 The Bar alleges that Poole is subject to discipline for violating RPC 3.4(b) and/or RPC 8.4(c) "[b]y backdating the May 28, 2001 invoice and/or presenting it to opposing counsel in the lien matter." CP at 7. As to this charge, the hearing officer found that "Poole did not prepare a May 28th, 2001 invoice to Mr. Matson until much later, probably between October 5 and 8, 2001." FOF 61. Then, in October, "Poole knowingly and intentionally backdated the May 28, 2001 billing statement and sent it to Mr. Lee" in a "deliberate attempt to mislead Mr. Lee and Mr. Matson," and that in doing so violated both RPC 3.4(b) and RPC 8.4(c).[4] Conclusion of Law (CL) 67.

¶19 RPC 3.4(b) provides that "[a] lawyer shall not . . . [f]alsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law." RPC 8.4(c) provides that "[i]t is professional misconduct for a lawyer to . . . [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation."

¶20 Poole asserts here that the Bar failed to prove by a clear preponderance of the evidence that he " 'knowingly and intentionally' " fabricated and " 'backdated' " the May 28

---

[4] As an initial matter, Poole contends that this charge should be covered exclusively by RPC 8.4(c) and not RPC 3.4. *See* Reply Br. of Poole at 13-14; Br. of Att'y Poole at 31. He contends that we have previously applied RPC 3.4 only when the attorney's conduct relates to his or her role as an advocate and that here the parties were involved in a "private dispute." *Id.* Poole's argument ignores the obvious—Matson and Poole were in fact involved in a legal dispute over a lien placed on Poole's LLC's property and that Matson was represented by separate counsel. Poole's attempts to characterize this as a "private dispute" ignores the litigious nature of their private dispute and Poole's role as advocate on his own behalf. RPC 3.4 encompasses "Fairness to Opposing Party and Counsel." In the context of the dispute, Matson, in addition to being a former client, was also an "opposing party" within the context of the rule. RPC 3.4. As such, RPC 3.4 is properly charged in this instance.

invoice reflecting a zero balance. DP at 41 (quoting CL 67). Poole rests his challenge on his assertion that the Bar failed to prove he did not create and send such an invoice in May 2001. While the Bar claims that the two documents dated May 28, 2001 were created in October, backdated, and never sent to Matson, *see* FOF 58, Matson, on direct examination by the Bar counsel, testified that he received the May 28 letter and invoice. *See* Transcripts (TR) at 220-22. Despite Matson's testimony, the hearing officer, while finding there was "conflicting and insufficient evidence to determine if Mr. Poole sent the May 28, 2001 *letter* to Mr. Matson," concluded that the Bar in fact "met its burden of proving that Mr. Poole did not prepare or send to Mr. Matson the *invoice* on or about May 28, 2001." FOF 59, 60 (emphasis added). Several factors led the hearing officer to draw this conclusion. First, Poole claimed that he was unable to locate the hard copy of the invoice even though he has one for every other bill. FOF 60(a). Second, while Poole gave various explanations for why the credit failed to appear on subsequent invoices, the hearing officer, relying on testimony from the Bar's expert, Carol Pearson,[5] found Poole's explanations were "not credible." FOF 60(a), 60(e). Finally, the hearing officer concluded that the only plausible reason for Poole to send the backdated May 28 statement to Lee without explanation was to deceive Lee into thinking that the statement was sent to Matson on

---

[5] During the investigatory process and at the hearing, Poole gave two potential explanations for why the disputed May 28 credit failed to appear on any subsequent invoice. Poole alternatively claimed (1) that the credit was never " 'finalized' " in the "TimeSlips" program and (2) that a " 'date-restrictor' " may have been applied that would have allowed only certain activity to be reflected in subsequent statements. FOF 60(d), (f). Pearson, the Bar's TimeSlips expert, refuted both of Poole's explanations. She testified that had Poole generated a billing statement on May 28 crediting Matson's account and not "finalized" it, the credit would nevertheless have appeared on the next statement. FOF 60(d). This did not occur. *Id.* Additionally, Pearson refuted Poole's "date-restrictor" theory when she testified that even if Poole's TimeSlips program had been set up to register only activity occurring before May 28, 2001, again, the alleged May 28 credit would have nevertheless appeared on subsequent statements. FOF 60(e). Finally, while Pearson testified that there were two circumstances under which an entered credit would not appear on a subsequent invoice, both required Poole or his staff to intentionally delete the credit or intentionally prevent it from reappearing, and the hearing officer found "[n]either occurred." FOF 60(f).

May 28, 2001. FOF 60(h). In sum, the hearing officer, after reasonably determining that Poole could not adequately explain why he had no hard copy of the invoice nor why the credit was not reflected on any subsequent account, found that the invoice was never sent in spite of Poole's and the grievant's testimony that it was in fact sent and received. In essence, she concluded that an invoice was never created and, as such, could never have been sent. FOF 60.

¶21 Despite both Poole's and Matson's testimony, the hearing officer and the Board refused to find that Poole sent Matson an invoice in May 2001. We have previously stated that we will not reject a factual finding based simply on an alternative explanation or version of the facts previously rejected by the hearing officer and Board. *See In re Disciplinary Proceeding Against Romero*, 152 Wn.2d 124, 133, 94 P.3d 939 (2004). As the hearing officer, and not this court, is tasked with making factual determinations, and as substantial circumstantial and expert testimony support her findings, we decline to overturn them here.

¶22 In spite of Poole's efforts to cloud the issue by refocusing the dispute on whether the May 28 invoice was ever sent, the principal issue remains whether he created a new invoice on October 8 and assigned it a May 28 date. In fact, it remains undisputed that Poole created and then backdated an invoice in October 2001 to appear to be an invoice created in May 2001. FOF 60(b); TR at 128-31. Poole testified that he "believe[d]" he sent a similar invoice in May, TR at 555, but this belief is irrelevant as to whether he violated RPC 3.4(b) and 8.4(c). Based on this belief, Poole attempts to characterize the date change as an "immaterial misrepresentation" and asks this court to impose a materiality requirement in order for misrepresentations to warrant discipline. Reply Br. of Poole at 14. We decline to accept Poole's rationalization as a legal defense. *Cf. In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 616, 98 P.3d 444 (2004) (finding attorney's "motivation . . . inapposite" and rejecting attorney's attempts to deconstruct his declarations); *In re Disciplinary*

*Proceeding Against Dann*, 136 Wn.2d 67, 77-78, 960 P.2d 416 (1998) (rejecting justifications for initial-switching on billing invoices even when same resulted in lower fees); *In re Disciplinary Proceeding Against Boelter*, 139 Wn.2d 81, 94-95, 985 P.2d 328 (1999).

¶23 As set forth above, RPC 3.4(b) and 8.4(c) instruct that it is professional misconduct for an attorney to "[f]alsify evidence" or "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation." We have stated that to determine whether an attorney violated RPC 8.4(c), we are tasked with determining simply "whether the attorney lied." *Dann*, 136 Wn.2d at 77. Poole's attempts to minimize the creation of a new document as "not material" and not a misrepresentation as it "accurately reflect[ed] a zero balance" are unpersuasive. Br. of Att'y Poole at 26-27. Poole's arguments that the date change was immaterial is simply wrong. The dispute between Poole and Matson, as of that date, was whether Poole had zeroed out Matson's bill as of May 2001. Despite the fact that Matson continued to receive invoices reflecting a balance in excess of $16,000 over the summer, *see* FOF 38-39, Poole claimed to have documents supporting his position that he credited Matson's account. For whatever reason, either because of a technical error, as he asserts, or because none was ever created, as the Bar charges, he was unable to locate an invoice. He then created one and, in both deposition testimony and direct testimony at the hearing, admitted to preparing and backdating an invoice in October 2001 with a May 28, 2001 date. When he provided this invoice to Matson's attorney, he offered no explanation as to its authenticity. In doing so, Poole engaged in a blatant misrepresentation in an effort to mislead Matson and his attorney into believing Poole possessed evidence that he wrote off Matson's account.

¶24 We thus reject Poole's rationalizations as insufficient and affirm the Board's conclusion that Poole violated RPC 3.4(b) and 8.4(c) by creating an invoice in October

2001, dating it May 28, 2001, and providing it to an opposing counsel,[6] in this case counsel for a former client.

Count 4: $27,675.35 Not Placed in Trust Account

 ¶25 The Bar alleges that Poole is subject to discipline for "failing to put Mr. Matson's judgment award of $27,675.35 in the BFC lawsuit into his client trust account" in violation of RPC 1.14(a). CP at 7. The hearing officer found this charge proved, holding that "[t]he BFC payment constituted funds belonging in part to Mr. Matson and Mr. Poole" and that RPC 1.14(a) "requires all funds of a client paid to a law firm to be deposited into [the firm's] trust account." CL 71. Poole contends here that the hearing officer's conclusion is contrary to her own findings of fact which reflect the parties' agreement that the entirety of the judgment be credited toward Matson's legal fees. Br. of Att'y Poole at 17.

¶26 RPC 1.14(a) provides:

> All funds of clients paid to a lawyer or law firm, including advances for costs and expenses, shall be deposited in one or more identifiable interest-bearing trust accounts maintained as set forth in section (c), and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
>
> . . . .
>
> (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

---

[6] Poole's attempt to distinguish his alleged violation of RPC 3.4(b) based on the fact that the invoice was never submitted to a tribunal nor was the subject of a sworn declaration is without merit. *See* Br. of Att'y Poole at 31. RPC 3.4, by its title, governs "Fairness to Opposing Party and Counsel." *Compare* RPC 3.3 (governing false evidence submitted to tribunal). It is evident that RPC 3.4(b) prohibits the type of action alleged here—the fabrication of evidentiary documents provided to opposing counsel.

¶27 The hearing officer's factual findings regarding the $27,675.35 judgment, and the corresponding relevant testimony, do not support her legal conclusion. The hearing officer found that "Mr. Matson agreed that Mr. Poole deserved to be paid, and that the money should come from what BFC paid as a result of the trial. He also agreed that the $27,675.35 check could be written to Mr. Poole's law firm." FOF 16; *see also* FOF 62. The Bar has not challenged this factual finding. Rather, the Bar contends (1) that Matson was unaware of the distinction between a firm's general account and trust account and never agreed to a deposit in the general account, (2) Poole failed to obtain Matson's written consent, and (3) Poole's failure to subsequently credit Matson's bill with this amount somehow reflects Matson's lack of agreement. Answering Br. of Bar at 30-31.

¶28 Matson testified directly to this subject at the hearing.

Q. What do you recall about conversations with Mr. Poole about where that $27,675 check was going to go?

A. As close as I can recall, *I had agreed that—I mean, he had been representing me for a long time and I hadn't paid very much towards his representation at that time, and it was agreed that he would apply it to my account.*

Q. Is that the language he used?

A. I believe so.

Q. Did you know what that meant at the time?

A. Just that *it would be applied to what I owed him.*

TR at 200 (emphasis added); *see also* TR at 203, 235. While it is true Matson professed a lack of understanding regarding the distinction between trust accounts and other accounts, *see id.*, it is nonsensical that Matson's lack of understanding regarding trust accounts implies that he believed that the check was going to be deposited in one and not the other. His clear testimony and the hearing officer's own unchallenged findings of fact are to the contrary. Second, while it may have been prudent for Poole to obtain

Matson's written consent as to whether the $27,675.35 check was to be applied as a payment, the rules do not impose such a requirement. *Compare* RPC 1.8(b), 1.9(a) (requiring written consent in *other* client dealings).

¶29 The ongoing confusion that permeates this dispute arises from the fact that Poole never did in fact credit Matson's account with the $27,675.35. While the hearing officer correctly noted that Poole acted "negligently" in his handling of the BFC award, *see* DP at 57, his failure to place the same in his trust account was not a violation of RPC 1.14(a)(2). In sum, because the hearing officer's legal conclusion that Poole violated RPC 1.14(a)(2) does not flow from the relevant findings of fact, *see contra* FOF 16, 62; *cf. In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 815, 72 P.3d 1067 (2003), we reverse the Board's conclusion that Poole violated RPC 1.14(a)(2) by failing to deposit the $27,675.35 in his firm's client trust account.[7]

Count 5: Failure To Account for Disbursement of $27,675.35

■■■ ¶30 The Bar alleges that Poole violated RPC 1.14-(b)(3) "[b]y failing to account to Mr. Matson for the distribution of the BFC judgment award of $27,675.35." CP at 7. The hearing officer found that "Mr. Poole failed to account for the distribution of the $27,675.35 payment from BFC for eight months and all the statements he sent to Mr. Matson (which he testified he personally reviewed) after receiving the check on January 2, 2001 gave Mr. Matson no credit for the payment." CL 72. The hearing officer concluded that this failure "created misunderstanding, mistrust and direct financial harm to Mr. Matson." *Id*. Poole contends here that the hearing officer erred in entering this conclusion based on his contention that " 'an attorney need not account for funds which represent the sum due him for

---

[7] Accordingly, we also reverse the inconsistent findings of fact, or portions thereof, that reflect the hearing officer's mistaken conclusion that Poole was withholding a portion of the BFC judgment. *See* FOF 32, 46, 61, 66.

attorneys fees.' "[8] Br. of Att'y Poole at 21 (quoting *In re Disciplinary Proceeding Against Fraser*, 83 Wn.2d 884, 894, 523 P.2d 921 (1974)). While Poole "concedes that the $27,675.3[5] payment should have been accurately reflected on Mr. Matson's billing statements," he asserts that RPC 1.14(b)(3) is inapplicable because it applies only to " 'properties of a client' " and here the parties agreed to apply the award toward Matson's legal fees. Br. of Att'y Poole at 32. The Bar counters that Poole's "poor[ ] and inaccurate[ ] mainten[ance of] records regarding the . . . BFC" judgment funds violated RPC 1.14(b)(3). Answering Br. of Bar at 32.

¶31 RPC 1.14(b)(3) mandates that "[a] lawyer shall . . . [m]aintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his or her client regarding them."

¶32 Contrary to Poole's position, it is axiomatic that, at some point, for Matson to agree to apply the $27,675.35 toward his legal fees, the $27,675.35 belonged to Matson. The BFC judgment was awarded to Matson not to Poole & Associates. FOF 15. While we agree with Poole that the parties agreed to apply the amount toward Matson's legal fees and, as such, Poole did not commit misconduct by failing to deposit the same in his trust account,[9] he did for eight months fail to properly account for the disbursement of *Matson's* $27,675.35. Poole accepted money rightfully belonging to Matson, per their oral agreement, and then failed to make any record of that acceptance and failed to create or provide Matson with an accurate invoice reflecting the application of these funds. As such, we affirm the Board's conclusion that Poole violated RPC 1.14(b)(3) by

---

[8] On appeal to the Board, Poole alleged that he "did indeed fully account for the distribution of the $27,675.35. Matson knew full well that the funds were being applied to his billing." CP at 82. Poole's failure to *ever* provide Matson with an accurate billing statement reflecting that these funds were ever applied to his billing discredits this argument. Agreeing to do something and actually accounting for that action are not synonymous. The Board properly rejected this argument.

[9] *See supra* pp. 214-16.

failing to properly account for the $27,675.35 BFC judgment award when, for a period of 10 months, he failed to "[m]aintain complete records of all funds . . . of a client coming into [his] possession" and failed to even once "render [an] appropriate account[ ] to his . . . client regarding them." RPC 1.14(b)(3).

### Count 6: Two Month Delay in Payment of Settlement Amount

 ¶33 Finally, the Bar charged Poole with violating RPC 1.14(b)(4) "[b]y failing to pay Mr. Matson the $7,675.35 of the BFC judgment award until December 2001." CP at 8. Based on this charge, the hearing officer determined that Poole's failure to pay the agreed $7,675.35 plus interest, as agreed to in an October 9, 2001 settlement, until December 9 and 10 constituted a violation of RPC 1.14(b)(4).

¶34 RPC 1.14(b)(4) mandates that "[a] lawyer shall . . . [p]romptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive." *See also* 2 KARL B. TEGLAND, WASHINGTON PRACTICE: RULES PRACTICE RPC 1.14 author's cmts. at 409 (6th ed. 2004) (commenting that RPC 1.14, at its essence, relates to lawyers' trust accounts and the implementation of the IOLTA (interest on lawyer's trust account) system).

¶35 Relevant to this count, Poole and Matson dispute the nature of the $7,675.35 settlement amount. Poole consistently maintained, and the record reflects, that as of February 2001 the balance in Poole's trust account belonging to Matson was zero. Ex. 10. In fact, at least until Matson completed the trench work, it was Matson who continued to owe Poole money. Nevertheless, likely following his conversation with an uninvolved attorney in a separate matter, Matson came to the mistaken understanding that Poole was withholding $7,675.35 from the BFC judgment that rightfully belonged to him. *See* TR at 235. Thus, following completion of his trench work, he wrote Poole, accusing him

of wrongfully "holding the balance of the claim that was awarded to [him] (approx. 7500.00) against the rules of professional responsibility" and demanded the "balance of [his] trust account" returned to him. Ex. 14; FOF 31. However, no balance of the BFC judgment was owing him, and there were no funds in the firm's trust account allotted to Matson.

¶36 The critical fault with this count, as brought and prosecuted by the Bar, is that no amount of the $7,675.35 represented moneys owing Matson from the "BFC judgment." CP at 8. The Rules for Enforcement of Lawyer Conduct (ELC) prescribe that "[t]he formal complaint must state the respondent's acts or omissions in sufficient detail to inform the respondent of the nature of the allegations of misconduct." ELC 10.3(a)(3); *see contra* Civil Rules CR 8(a) (requiring only a "short and plain statement of the claim"). At no point did the Bar's complaint accurately reflect the charge of misconduct levied against Poole.

¶37 Based on the erroneous nature of the Bar's charging document, and the fact that it failed to accurately reflect the nature of Poole's alleged misconduct, we reverse the Board's conclusion that Poole violated RPC 1.14(b)(4) as charged by the Bar.[10] We do so because the disputed funds, contrary to the hearing officer's conclusions, did not arise out of Poole's improper retention of Matson's portion of the BFC judgment.[11] It was on this basis that the Bar charged count 6, *see* CP at 8 (charging Poole with "failing to pay Mr. Matson the $7,675.35 of the BFC judgment award until December 2001"), and on which the hearing officer concluded the charge was proved. *See* CL 71-72. This conclusion is not supported by the findings of fact, *see contra* FOF 16, 62, and thus we reverse count 6 as unproved.

---

[10] The Bar argues on appeal that Poole became obligated to pay the settlement amount "[w]hen Poole entered into the agreement with Lee and Matson" in October 2001 and that "[h]is failure to do so is a violation of RPC 1.14(b)(4)." Answering Br. of Bar at 33. However, at no point in its investigation or prosecution of this count did the Bar elect to amend its formal complaint to reflect this apparent change in position. *See* ELC 10.7(a). *Cf. Bonet*, 144 Wn.2d at 510.

[11] *See supra* pp. 214-16.

## Appropriate Sanction

¶38 The American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) (*Standards*) govern lawyer sanctions in Washington. *In re Disciplinary Proceeding Against Cohen*, 150 Wn.2d 744, 758, 82 P.3d 224 (2004). "This court evaluates whether the hearing officer properly determined the presumptive sanction by considering (1) the ethical duty or duties that the lawyer violated, (2) the lawyer's mental state, and (3) the actual or potential injury caused by the lawyer's misconduct." *Id.* "Next, we consider whether the hearing officer properly weighed the aggravating and mitigating factors." *Id.* Finally, this court "considers the recommended sanction in light of . . . the degree of unanimity among the Board and its proportionality with sanctions imposed for similar misconduct." *Id.* (citing *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 259, 66 P.3d 1057 (2003)).

### 1. Presumptive Sanction

¶39 *Ethical Duties Violated*: As discussed above, we conclude that the Bar has proved counts 1 and 5, reflecting Poole's violation of RPC 1.14(b)(3), 3.4(b) and 8.4(c).

¶40 *Lawyer's Mental State*: The parties dispute Poole's mental state in backdating the invoice and submitting it to his former client and his counsel.[12] While the hearing officer and the Board concluded that Poole acted "knowingly and intentionally," CL 67; DP at 41, Poole asserts that his conduct was merely "negligent." *See* Br. of Att'y Poole at 38 (citing STANDARDS stds. 5.13, 4.63). The Bar supports the hearing officer's finding.

¶41 The *Standards* define "[i]ntent" as "the conscious objective or purpose to accomplish a particular

---

[12] The parties do not dispute the hearing officer's conclusion that Poole was negligent in violating RPC 1.14(b)(3) as charged in count 5. CL 71 (describing Poole's failure to account as both negligent and grossly negligent). *See* Answering Br. of Bar at 35 n.11; Reply Br. of Att'y Poole at 16. As such, the parties agree that the Board properly concluded that the presumptive sanction for Poole's violation of RPC 1.14(b)(3) is reprimand. *Id.*

result"; "[k]nowledge" as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result;" and "[n]egligence" as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." STANDARDS *Definitions* at 7.

¶42 Substantial evidence supports the hearing officer's finding that Poole acted "knowingly" and "intentionally" in violating RPC 3.4(b) and 8.4(c). Poole's principal counterargument that he also sent Matson an invoice in May 2001 does not mitigate the undisputed fact, and his own repeated testimony, that he created a false document and sent it to his former client and opposing counsel without explanation. *See* Ex. 49, at 72; TR at 130, 572-73. When Poole created the May 28 invoice in October, he was not simply acting carelessly, but rather he purposefully created a new document and assigned it a false date. As the hearing officer determined, he did so with the intent to mislead Mr. Lee. FOF 60(h), 61. Poole's failure to qualify the authenticity of the invoice at the time he provided it, or in his subsequent conversation with Lee until confronted on the subject, support the conclusion that Poole acted with the intent to deceive. As such, the hearing officer found, and the record supports her conclusion, that Poole was *consciously aware* that he was providing Matson's attorney with fabricated evidence and acted with the *conscious objective or purpose* to deceive Lee and Matson as to the genuineness of the invoice. *See* FOF 58, 60(b), 60(g), 60(h), 61. *Cf. Dynan*, 152 Wn.2d at 618 (attorney "consciously aware" in providing court with untrue evidence).

¶43 *Actual or Potential Injury*: Standard 4.62, upon which the hearing officer relied, presupposes a finding of injury or potential injury to the client. The hearing officer found Poole harmed Matson by failing to timely pay the settlement amount and by negligently failing to account for the BFC judgment, CL 72, concluding that "Mr. Matson was

injured by the stress and cost of having to hire an attorney to represent him to deal with Mr. Poole and having his funds withheld from him for a period of time."[13] DP at 66. None of this harm, upon which the hearing officer principally relies, relates to the falsified invoice. As such, the hearing officer must have necessarily found "potential injury" in recommending the application of standard 4.62. DP at 65; *see* STANDARDS std. 4.62.

■ ¶44 The *Standards* defines "[p]otential injury" as "harm . . . that is reasonably foreseeable at the time of the lawyer's misconduct, and which, but for some intervening factor or event, would probably have resulted from the lawyer's misconduct." STANDARDS *Definitions* at 7. While Poole asserts that Matson was not injured by his conduct, the Bar defends the hearing officer's conclusion that Poole's dishonesty "could have," CL 67, caused Matson harm, contending that "[h]ad Lee accepted Poole's deceptions, Matson's position in the lien litigation would likely have been seriously compromised." Answering Br. of Bar at 40. *Cf. In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 720, 72 P.3d 173 (2003) (finding attorney "harmed her client by casting doubt on his claims"). However, this "potential injury" is both thin and highly speculative, and significantly, it does not speak to the underlying fee dispute and billing discrepancies which the settlement ultimately turned on. The hearing officer's findings do not sufficiently reflect that Poole's actions had the real potential to cause injury to Matson. The hearing officer's lone conclusory statement that Poole's actions "could have" caused injury is an insufficient basis upon which to affirm this finding.

■ ■ ¶45 In sum, the hearing officer found Matson suffered no actual injury as a result of Poole's dishonest conduct, and we additionally find any "potential injury" to

---

[13] The hearing officer did conclude that Poole's actions "cause[d] harm to the legal system," CL 67, a conclusion Poole does not directly address and which we unhesitatingly support.

Matson to be unsupported by the record. Absent injury to Matson, we reverse the Board's reliance on standard 4.62 in favor of standard 4.64. *See* STANDARDS std. 4.64 ("Admonition is generally appropriate when a lawyer engages in an isolated instance of negligence in failing to provide a client with accurate or complete information, and causes little or no actual or potential injury to the client.").[14] However, in doing so, we remain mindful that we have previously stated that the presumptive sanctions set forth in *Standards* generally "makes it clear that suspension is the appropriate sanction where an attorney acted with knowledge." *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393, 416, 98 P.3d 477 (2004); *see also* STANDARDS std. 4.62. This is especially relevant where, as here, the misconduct at issue, while causing no harm, is premised on an attorney's dishonesty and fabrication of documents, an act which reflects especially poorly on the profession. In addition, we are mindful that the hearing officer and the Board specifically rejected Poole's characterization of his mental state as merely negligent, the much less culpable state of mind associated with standard 4.64. In short, the sanctions set forth in standard 4.6 fail to completely address the situation where an attorney knowingly falsifies a document with the intent to deceive, but his or her act causes no injury to the client.

¶46 Thus, we now hold, based on *Standards* stds. 4.64 (admonition), 4.13 (reprimand), and 5.13 (reprimand), that reprimand is the presumptive sanction for the proven offenses but find Poole's culpable state of mind significant.

---

[14] The Bar contends that standards 4.61 and 5.11, both establishing disbarment as the presumptive sanction, are more appropriate. *See* Answering Br. of Bar at 26-40. However, as the hearing officer made no findings that would suggest Matson was or could have been "seriously injured," standard 4.61 is inapplicable. Second, the Bar's contention that disbarment is appropriate because Poole "engage[d] in . . . other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice," STANDARDS std. 5.11(b), is unsupported. It is not apparent that Poole's actions, while certainly misconduct, "*seriously* adversely reflect[s] on [his] fitness to practice." *Id.* (emphasis added). Based on the Board's recommendation of a one-year suspension, it is evident that, save one dissenter, the Board disagreed with the Bar on this issue as well.

2. Aggravating and Mitigating Factors

¶47 *Dishonest or Selfish Motive*: The hearing officer found Poole acted with a dishonest or selfish motive as to both the deposit of the BFC judgment and the fabrication of the invoice. FOF 60(h); CL 61, 66-67. Poole challenges the hearing officer's conclusions with regard to the failure to deposit the BFC judgment, a count we reverse, and not as to the fabrication. Substantial evidence supports finding that Poole's knowing falsification of evidence was motivated by a dishonest and selfish motive. *See contra Dynan*, 152 Wn.2d at 621 (overturning aggravating factor where "record show[ed] that [attorney] did not intend to deceive the court, did not intend to benefit himself, and did not receive a direct or indirect benefit from his actions"). Here, unlike in *Dynan*, by fabricating the invoice Poole did intend to mislead Lee and Matson for his own benefit. However, when considering the weight to assign to this aggravating factor, it is notable that, unlike some other cases, it was not proved that Poole misappropriated funds for his own use nor falsified the invoice in an attempt to conceal funds he was wrongfully withholding. *Contra In re Disciplinary Proceeding Against Schwimmer*, 153 Wn.2d 752, 759-60, 108 P.3d 761 (2005). Nevertheless, because his falsification of an evidentiary document is inherently dishonest, we agree that Poole acted with a dishonest and selfish motive in fabricating the May 28 invoice.

¶48 *Refusal To Acknowledge Wrongful Nature of Conduct*: Poole has rightfully conceded the wrongful nature of the alleged bookkeeping errors, yet has continued to maintain that his fabrication of the disputed invoice was "immaterial." Br. of Att'y Poole at 27-28. He continues to refuse to acknowledge that such falsification, *regardless* of his belief regarding what was previously created and sent, is the essence of the misconduct. As such, this is a proper aggravating factor.

¶49 *Substantial Experience in the Practice of Law*: Poole challenges this aggravating factor only as it relates to the alleged bookkeeping errors. *See* Br. of Att'y Poole at

41. Because, in our view, the most serious misconduct alleged here deals not with bookkeeping but with candor and integrity, Poole's substantial experience in the practice of law (17 years) is rightfully considered as an aggravating factor.

¶50 *Prior Discipline*: The Board reprimanded Poole in 2004 for mishandling of client funds between August 1996 and December 2001 in violation of RPC 1.14. *See* Br. of Att'y Poole, App. C. The Board, in adding this factor, concluded that *Cohen* instructs that this "prior reprimand" should be considered in determining the appropriate sanction. DP at 42. *Cohen* does not so instruct. *Cohen* simply stated that, in that case, Cohen's separate misconduct was properly considered "as evidence of a pattern of misconduct" not as a prior disciplinary offense. 150 Wn.2d at 761-62. The Bar's reliance on *In re Disciplinary Proceeding Against Brothers*, 149 Wn.2d 575, 586, 70 P.3d 940 (2003) is similarly misplaced. In *Brothers*, we held that a separate disciplinary offense can be considered a prior offense so long as the attorney "was aware that he was under investigation." *Id.* at 586; *see also In re Disciplinary Proceeding Against Lopez*, 153 Wn.2d 570, 594, 106 P.3d 221 (2005). Here, the limited evidence in the record suggests that Poole's trust account was audited in 2002 and the Bar filed a formal complaint in September 2002. *See* Ex. 48, at 7, 12. There is no evidence to suggest that Poole knew he was under investigation during 2001 when the misconduct at issue in this case occurred. As such, based on *Cohen* and *Brothers*, the Board improperly considered Poole's previous reprimand as supporting the aggravating factor of "prior discipline."

¶51 *Multiple Offenses*: While Poole assigns error to application of this as an aggravating factor, he articulates no reason why it is erroneous. As we uphold two counts of misconduct, one of which is based on over eight months of continued misconduct, the Board properly considered multiple offenses as an aggravating factor.

██ ¶52 *Submission of False Evidence, False State-ments, or other Practices during Disciplinary Process*: The Bar asserts that the Board improperly rejected this factor and that it is supported by the hearing officer's finding that Poole's testimony regarding the invoice was "not credible." Ass'n's Pet. for Review at 3; DP at 49. The Bar articulates no argument in its briefing in support of this issue. Because a hearing officer's finding regarding the credibility of testimony does not *necessarily* lead to the conclusion that the witness made an intentional false statement, we reject the Bar's suggestion that we add this as an aggravating factor.

¶53 *Mitigating Factors*: Neither the hearing officer nor the Board found any mitigating factors. DP at 41-42, 57-58. Poole's suggestion that this court find a "lack of dishonest or selfish motive" would be inconsistent with our reasoning above, and we thus reject his suggestion. Br. of Att'y Poole at 43.

¶54 *Application of Aggravating Factors to Presumptive Sanction*: We affirm the Board's finding of the aggravating factors of dishonest or selfish motive, refusal to acknowledge wrongful nature of conduct, substantial experience in the practice of law, and multiple offenses but reverse as to prior discipline. We additionally recognize that three of the aggravating factors relate directly to count 1 which, balanced against a lack of mitigating factors, counsel in favor of departing upward from an admonition or reprimand, and coupled with Poole's highly culpable mental state in fabricating the invoice, a suspension is the more appropriate sanction.

██ ██ ¶55 An attorney's duty of candor in dealing with his or her clients and opposing counsel is a duty of the highest order. Our judicial system and the administration of justice are dependent on the honesty of attorneys as officers of the court, and violations of this paramount duty reflect poorly not just on the attorney who commits the misconduct but on the profession as a whole. This is especially true when the dishonest act is done knowingly and with the purposeful intent to deceive. As such, suspen-

sion is the appropriate sanction and in imposing a suspension, while we have departed from the rule on occasion, we note the *Standards'* suggestion that "[g]enerally, suspension should be for a period of time equal to or greater than six months." STANDARDS std. 2.3; *see Dynan*, 152 Wn.2d at 624; *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 495, 998 P.2d 833 (2000); *Boelter*, 139 Wn.2d at 105-06. We believe a six-month suspension is commensurate with the misconduct proved here.

### 3. Remaining *Noble* Factors

¶56 Finally, after applying *Standards* to discern the presumptive sanction and applying any relevant aggravating or mitigating factors, we consider the revised *Noble* factors of "proportionality" and "degree of unanimity" in assessing the appropriateness of a given sanction. *See Kuvara*, 149 Wn.2d at 257-59 (citing *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983)).

¶57 *Proportionality*: Poole offers several cases to persuade this court that the Board's imposition of a one-year suspension in this case is "grossly disproportionate" to analogous discipline cases, relying principally on *Carmick*, *Boelter, Dynan*, and *McKean* (*In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 64 P.3d 1226 (2003)). *See* Br. of Att'y Poole at 46-49. Based on his arguments, it is evident he likewise would assert that a six-month suspension would also be disproportionate. The Bar contends that recent discipline cases suggest disbarment would be the most appropriate sanction.

¶58 First, Poole discusses *In re Disciplinary Proceeding Against Carmick*, in which this court affirmed the Board's imposition of a 60-day suspension where the attorney misrepresented to the court the opposing party's knowledge of an ex parte order and contacted a represented adverse party. *Carmick*, 146 Wn.2d at 587. Poole asserts his conduct is less severe because "[he] never made any false statements." Br. of Att'y Poole at 46. While strictly speaking this may be true, his creation of an invoice in October to

appear to be one created May 28 and his active submission of that evidentiary document to his former client's attorney is certainly an egregious, dishonest act meriting suspension. Additionally, in *Carmick*, the court determined that the attorney's misrepresentation, while done knowingly, unlike here, was neither intentional nor material. *Id.* at 602-03. We rejected Poole's similar arguments here. Thus contrary to Poole's assertion, it cannot be said that he is significantly less culpable than Carmick.

¶59 Next, Poole points to *In re Disciplinary Proceeding Against Boelter* to support a less serious sanction. In *Boelter*, this court affirmed the Board's imposition of a six-month suspension where the attorney misrepresented facts to his former client in a letter, threatened to disclose client confidences, falsely claimed to hold a tape recording of a client conference, and signed an affidavit attesting to the fact. *Boelter*, 139 Wn.2d at 93-95. Poole is correct in noting that the extent of the misconduct at issue in *Boelter* is more serious than that present here. The reasons the Board imposed only a six-month suspension in that case are not clear, but we found such a length to be "easily supportable" and deferred to the Board's conclusion. *Id.* at 106. While the *Boelter* case suggests a suspension in excess of the six months imposed there may be disproportionate, the more recent case of *In re Disciplinary Proceeding Against Dynan*, also discussed at length by Poole, is more instructive.

¶60 In *Dynan*, we reduced the Board's imposition of a nine-month suspension and imposed a six-month suspension where an attorney, in a declaration and attached billing statements supporting a motion for attorney fees, "whited out" his actual hourly rate of $100-120 and replaced it with $150 per hour. *Dynan*, 152 Wn.2d at 607. However, based on a finding of lack of actual harm and the absence of a dishonest or selfish motive, we departed downward from the presumptive sanction of disbarment implicated by false swearing. *Id.* Comparing Dynan's misconduct to Poole's, it is evident that Dynan was somewhat

less culpable. Contrary to the findings here, in *Dynan*, the Board concluded that Dynan "did not believe the actual fee amount was material to a reasonable attorney fee award and Dynan did not intend to deceive the court." *Id.* at 610. On the contrary, here the Board rejected Poole's materiality argument and found that Poole did intend to mislead both Lee and Matson by faxing the fabricated document. DP at 41 ("Poole 'knowingly and intentionally backdated the May 28, 2001 billing statement and sent it to Mr. Lee [in] a deliberate attempt to mislead Mr. Lee and Mr. Matson.'" (quoting CL 67)). Thus, imposition of a suspension of six months or greater would not be disproportionate with the recent sanction imposed in *Dynan*.[15] *See Dynan*, 152 Wn.2d at 624.

¶61 The Bar points to several disciplinary cases to suggest that proportionality actually favors disbarment in this case, positing that "[t]he most analogous case is" *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 72 P.3d 173 (2003). Answering Br. of Bar at 45. In *Whitt*, this court rejected the recommended two-year suspension and ordered Whitt disbarred for, among other things, "making false representations and fabricating evidence during the disciplinary process." 149 Wn.2d at 710. Whitt's misconduct was significantly more egregious and spanned multiple years. Specifically, Whitt dismissed her client's claim with prejudice without her client's knowledge or consent, never informed her client of the dismissal, and, when investigated by the Bar, provided false information and fabricated documents to support her contention that the client consented to the dismissal. *Id.* at 710-12. In *Whitt*, we applied standard 7.1, which establishes the presumptive sanction as disbarment, and further recognized that "[f]alsifying information during an attorney discipline proceeding is one of the most egregious charges that can be levied against an attorney." *Id.* at 720. While Poole's dishonest conduct is inexcusable, it did not rise to

---

[15] Poole's submission of *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 64 P.3d 1226 (2003) is uninsightful as it deals with no similar counts of misconduct. *Id.* at 859, 869.

the level present in *Whitt* where the misconduct "spanned a period of about three years" and culminated in making misrepresentations during the disciplinary investigation. *Id.* at 723. It cannot be contended that Poole's misconduct rose to this level, and this case fails to support disbarment.

¶62 Next, the Bar points to *In re Disciplinary Proceeding Against Guarnero.* In *Guarnero*, this court affirmed the Board's order disbarring an attorney for violating RPC 8.4(c) by forging his client's signature on a declaration; faxing the same to the trial judge; serving it on opposing counsel; preparing, serving, and filing a second declaration falsely denying the forgery; coercing his client into signing a similar false declaration; and continued representation of his client despite the evident conflict of interest. *Guarnero*, 152 Wn.2d at 57. Again, the presumptive sanction for Guarnero's conduct was disbarment, *id.* (citing STANDARDS stds. 4.61, 5.11), and again Poole's singular dishonest act does not compare with the extent of misconduct present in *Guarnero*. The extent of the dishonest and fraudulent actions present in both *Whitt* and *Guarnero* significantly exceed the conduct here and do not suggest disbarring Poole would be appropriate. In fact, quite to the contrary.

¶63 In sum, considering the conclusion that Poole acted knowingly and intentionally in fabricating the invoice, weighing four aggravating factors against a lack of mitigating factors, and comparing Poole's misconduct with that of the attorneys in the above discipline cases suggests that a six-month suspension would not be disproportionate with other discipline cases dealing with acts of dishonesty and misrepresentation. A six-month suspension would also be in accord with our precedent that a "suspension generally should not be less than six months." *Dynan*, 152 Wn.2d at 624. STANDARDS std. 2.3.

¶64 *Degree of Unanimity*: The Board voted 9-2 in favor of a one-year suspension, with one dissenter favoring reprimand and the other favoring disbarment. While we give less weight to the decision of a divided Board, *see Whitt*, 149 Wn.2d at 723, we give some weight to the high

degree of agreement present here, reflecting a near consensus that suspension is the most appropriate sanction.

## III

## Conclusion

¶65 In conclusion, we hold that the Bar failed to prove counts 4 and 6 but affirm the Board's ruling that the Bar proved counts 1 and 5 by a clear preponderance of the evidence. The presumptive sanction for count 1, due to a lack of harm to Matson, is admonition, and the presumptive sanction for count 5 is reprimand. However, recognizing that *Standards* std. 4.6 fails to adequately address the misconduct here and mindful that Poole's proven misrepresentation was done knowingly and intentionally, a state of mind generally meriting suspension under standard 4.6, we find the more appropriate sanction for Poole to be suspension. *See cf. Schwimmer*, 153 Wn.2d at 758 (*Standards* provides a "basic, but not conclusive, guide.").

¶66 In determining the appropriate length of a suspension, while we generally defer to the Board's determination, we note here that the Board improperly considered two counts of misconduct, one of which (failure to deposit funds in trust account) alone merited suspension, *see* STANDARDS std. 4.12; DP at 56, and further improperly added the aggravating factor of "prior discipline." Based on the reversal of these counts and the fact that Poole's intentional and knowing dishonest conduct, while egregious, does not appear to be part of a pattern of dishonesty but rather an isolated act that caused no harm to his client, we reverse the Board's imposition of a one-year suspension and reinstate the hearing officer's recommendation of a six-month suspension. Poole's intentional and knowing creation of a false invoice, coupled with the presence of multiple aggravating factors, certainly merits suspension. Following our practice that generally suspensions should not be less than six months, we conclude a six-month suspension is appropriate. We thus reinstate the hearing officer's recommended

sanction and order Poole suspended for six months followed by two years of probation and periodic audits of his trust account.

C. JOHNSON, OWENS, and FAIRHURST, JJ., and BROWN, J. Pro Tem., concur.

¶67 CHAMBERS, J. (concurring in result) — I agree completely with Justice Madsen's legal analysis, particularly her discussion of the standard of review and the difference between "knowing" and "intentional" states of mind. Dissent at 239-41. I also agree that a suspension is arguably too harsh under all of the facts of this case, especially given Jeffrey Poole's lack of disciplinary history at the relevant time.

¶68 However, I would defer to the hearing officer and her finding that Poole did not prepare the May 28, 2001 invoice until much later than May 28, 2001. Majority at 210-14, 221 (citing finding of fact 61 and conclusion of law 67). The hearing officer was present and able to observe the witnesses. Giving that fact the significant weight it deserves, it appears to me that her finding was supported by a clear preponderance of the evidence. *See In re Disciplinary Proceeding Against Guarnero,* 152 Wn.2d 51, 58, 93 P.3d 166 (2004). It follows then that the conduct was knowing and intentional and thus deserving of a significant sanction. *Accord* majority at 220-24.

¶69 Since I would show more deference to the hearing examiner's evaluation of the facts, I reluctantly concur with the majority in result.

¶70 MADSEN, J. (dissenting) — The majority correctly determines that the sanction of a one-year suspension imposed by the Disciplinary Board of the Washington State Bar Association (the Board) is not appropriate in this case. However, the majority uses an incorrect standard for reviewing the hearing officer's findings of fact. This error by the majority leads it to improperly rely on the hearing

officer's finding that Jeffrey Poole created and sent the May 28, 2001, invoice in October 2001. In addition, the majority fails to recognize that the letter that the hearings officer found was sent on May 28 contains the very same information provided in the May 28 invoice—Poole's acknowledgment to his client that the client's account carried a zero balance. This leads the majority to assign an incorrect mental state, add an unwarranted aggravating factor, and perform a faulty proportionality analysis. Properly analyzed, the conduct present here does not merit even a six-month suspension. I respectfully dissent.

## ANALYSIS

¶71 The Washington State Bar Association (the Bar) charged Poole with 10 counts of misconduct. The hearing officer found the Bar failed to prove counts 2 and 3, and counts 7 through 10 were withdrawn by the Bar and dismissed by the hearing officer. Additionally, the majority finds that the Bar failed to prove counts 4 and 6. Thus, the majority imposes a sanction based only on counts 1 and 5 for backdating the May 28, 2001, invoice and for failing to account for the distribution of a judgment award. Based on count 1, the majority imposes a six-month suspension, relying primarily on the hearing officer's finding that Poole intentionally attempted to deceive his client, Joseph Matson, and Bryan Lee, Matson's attorney, by backdating the May 28 invoice in October 2001.

¶72 The majority's first misstep is its reliance on the hearing officer's finding that Poole did not send the May 28 invoice until October. First, the majority applies the wrong standard for reviewing a challenge to the hearing officer's factual finding. Second, even if the hearing officer's finding that Poole created the May 28 invoice for the first time in October is correct, in spite of his client's testimony that he received the invoice in May, the hearing officer also found that the May 28 letter was sent in May. That letter contained the identical information as the May 28 invoice.

Thus, Poole did not backdate the invoice in October for the purpose of deceiving Matson into believing Poole had notified him of his zero balance in May 2001 when he had not.

## STANDARD OF REVIEW

¶73 Turning first to the standard for review, the majority states that this court will uphold the hearing officer's findings of fact if those findings are supported by substantial evidence, relying on *In re Disciplinary Proceeding Against Guarnero*, 152 Wn.2d 51, 93 P.3d 166 (2004), and ELC 11.12(b). *See* majority at 208-09. However, the authority relied on in *Guarnero* for support of this proposition states that this court will uphold a hearing officer's findings of fact if supported by a *clear preponderance* of the evidence. *See Guarnero*, 152 Wn.2d at 58; *cf. In re Disciplinary Proceeding Against Huddleston*, 137 Wn.2d 560, 568, 974 P.2d 325 (1999) ("This court will not disturb a hearing examiner's findings of fact if the findings are supported by a clear preponderance of the evidence."). Additionally, ELC 11.12(b), on which the majority relies for its faulty standard of review, pertains to the standard of review that the Board must apply when reviewing a hearing officer's or panel's decision, not the standard of review that applies when this court reviews a disciplinary matter.

¶74 Rather than a substantial evidence standard, this court has consistently stated that on appeal, "[w]e will uphold the hearing officer's findings of fact if they are supported by a clear preponderance of the evidence, even if the evidence is disputed." *In re Disciplinary Proceeding Against Anschell*, 141 Wn.2d 593, 606, 9 P.3d 193 (2000); *accord In re Disciplinary Proceeding Against Longacre*, 155 Wn.2d 723, 735, 122 P.3d 710 (2005); *In re Disciplinary Proceeding Against Whitney*, 155 Wn.2d 451, 461, ¶ 21, 120 P.3d 550 (2005); *In re Disciplinary Proceeding Against Kronenberg*, 155 Wn.2d 184, 193, ¶ 17, 117 P.3d 1134 (2005); *In re Disciplinary Proceeding Against Lopez*, 153 Wn.2d 570, 582, ¶¶ 24-25, 106 P.3d 221 (2005); *In re Disciplinary*

*Proceeding Against VanDerbeek*, 153 Wn.2d 64, 80, ¶ 27, 101 P.3d 88 (2004); *In re Disciplinary Proceeding Against DeRuiz*, 152 Wn.2d 558, 572, 99 P.3d 881 (2004); *In re Disciplinary Proceeding Against Egger*, 152 Wn.2d 393, 405, 98 P.3d 477 (2004); *In re Disciplinary Proceeding Against Dynan*, 152 Wn.2d 601, 607, 98 P.3d 444 (2004); *In re Disciplinary Proceeding Against Romero*, 152 Wn.2d 124, 133, 94 P.3d 939 (2004); *In re Disciplinary Proceeding Against Cohen*, 150 Wn.2d 744, 754, 82 P.3d 224 (2004); *In re Disciplinary Proceeding Against Kagele*, 149 Wn.2d 793, 813, 72 P.3d 1067 (2003); *In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 717, 72 P.3d 173 (2003); *In re Disciplinary Proceeding Against Cohen*, 149 Wn.2d 323, 330, 67 P.3d 1086 (2003); *In re Disciplinary Proceeding Against Miller*, 149 Wn.2d 262, 276, 66 P.3d 1069 (2003); *In re Disciplinary Proceeding Against Kuvara*, 149 Wn.2d 237, 246, 66 P.3d 1057 (2003); *In re Disciplinary Proceeding Against McKean*, 148 Wn.2d 849, 861, 64 P.3d 1226 (2003); *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 594, 48 P.3d 311 (2002); *In re Disciplinary Proceeding Against Juarez*, 143 Wn.2d 840, 869, 24 P.3d 1040 (2001); *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 483, 998 P.2d 833 (2000); *In re Disciplinary Proceeding Against Boelter*, 139 Wn.2d 81, 89, 985 P.2d 328 (1999); *Huddleston*, 137 Wn.2d at 568; *In re Disciplinary Proceeding Against Heard*, 136 Wn.2d 405, 414, 963 P.2d 818 (1998); *In re Disciplinary Proceeding Against Haskell*, 136 Wn.2d 300, 310, 962 P.2d 813 (1998); *In re Disciplinary Proceeding Against Dann*, 136 Wn.2d 67, 76, 960 P.2d 416 (1998); *In re Disciplinary Proceeding Against McMullen*, 127 Wn.2d 150, 162, 896 P.2d 1281 (1995).[16] "A clear

---

[16] A few cases use less than careful terminology in describing the necessary quantum of evidence. For example, as the majority notes, the court in *Huddleston*, 137 Wn.2d at 568, stated the clear preponderance standard, but then referred to " ' "substantial . . . testimony" ' is sufficient to support challenged findings of fact.' " *See* majority at 209 n.3 (quoting *Huddleston*, 137 Wn.2d at 568 (quoting *In re Disciplinary Proceeding Against Denend*, 98 Wn.2d 699, 704, 657 P.2d 1379 (1983))). However, there is no doubt that the correct standard is, as the overwhelming number of the court's cases show, the clear preponderance standard. The majority is misleading when it suggests that this is an unsettled question.

preponderance is a standard of proof between the simple preponderance required in a civil suit and the reasonable doubt standard required in a criminal action." *Carmick*, 146 Wn.2d at 594. In reviewing the hearing officer's findings of fact, we examine the entire record. *Huddleston*, 137 Wn.2d at 568. We uphold the hearing officer's conclusions of law if they are supported by findings of fact. *Id.*

¶75 Applying the correct standard of review to the facts, this court should reject the hearing officer's finding that Poole created and sent the May 28 invoice for the first time in October 2001. Before the hearing officer, Poole testified that his billing system was "a big mess" in April and May of 2001, Transcripts (TR) at 140, and he provided possible scenarios in which he could have produced the May 28 invoice but where that credit would not have shown up on subsequent billing statements. *See* TR at 136-39, 143-47. Further, although Carol Pearson, the Bar's expert on the "TimeSlips" billing program, testified that she thought it unlikely that the invoice was produced on May 28, she also testified that there are at least two circumstances in which Poole could have printed the invoice on May 28. Pearson stated the following:

Q. So there's at least two ways that, if I had put in a credit, that I could still generate a July 31 bill, Exhibit 17, and have the bill come out exactly—one, if the credit transaction had been deleted, and two, if I had turned off the include [sic] outside range [i.e., inserted a date restrictor]?

A. Yes, and specified specific dates.

TR at 414.

¶76 Finally, and perhaps most significantly, Poole's client, Matson, testified that he received the May 28, 2001, letter along with the May 28 invoice, indicating a zero balance. The following is an excerpt from Matson's testimony before the hearing officer:

Q. (By Mr. Hunsinger) So you got the letter from Mr. Poole May 28th with the bill?

A. Well, I want to make sure; I want to read this.

Q. Take your time.

A. (Pause.) Yes, I believe I received this.

Q. And you also received a bill showing a zero balance in May?

A. Yes.

TR at 220-21.

¶77 Without commenting on Matson's testimony, the hearing officer found that

> Mr. Poole did not prepare a May 28th, 2001 invoice to Mr. Matson until much later, probably between October 5 and 8, 2001. Mr. Poole intentionally misled Mr. Lee into believing he had prepared and sent it to Mr. Matson on or about May 28, 2001, and also intentionally tried to mislead Mr. Lee into believing there were no funds payable to Mr. Matson from the BFC proceeds.

Clerk's Papers (CP) at 51-52 (Hr'g Officer's Am. Finding of Fact, Conclusions of Law, and Recommendation).

¶78 As to Pearson's testimony that Poole could have created the invoice on May 28, the hearing officer dismissed either possibility. She cursorily concluded that "[t]here is no reason to believe any employee of Poole & Associates had any reason to intentionally delete the credit, or would have or could have deleted it accidentally." CP at 50 (Hr'g Officer's Am. Findings of Fact, Conclusions of Law, and Recommendations). Additionally, the hearing officer found the "date restrictor" theory implausible because "Poole would have had to intentionally create a credit that would not appear on the statement." *Id.*

¶79 The hearing officer's guesswork about what did or did not occur with the TimeSlips program ignores the most important piece of evidence pertaining to this count of misconduct: Matson's affirmative testimony that he received an invoice from Poole in May 2001 notifying him of a zero balance. Applying the correct standard of review, this finding is not supported by a clear preponderance of the evidence.

¶80 Despite Matson's testimony that he received the May 28 letter and invoice, and the Bar's expert's testimony that the invoice could have been created using the TimeSlips program, the majority proclaims that it will not reject the hearing officer's factual findings "based simply on an alternative explanation or version of the facts previously rejected by the hearing officer and Board." Majority at 212. However, Matson's testimony that he received the May 28 invoice is not merely an "alternative explanation or version of the facts previously rejected by the hearing officer."

¶81 The majority's reliance on this inadequate finding leads to a host of errors. First, this finding leads to the addition of one aggravating factor and the negation of a mitigating factor. Second, it leads to the assignment of an improper mental state. Finally, these compounding errors lead to an improper basis on which to compare the penalty imposed in this case with the penalties imposed in similar cases, resulting in a flawed proportionality review.

¶82 Turning first to the aggravating factor that Poole had a dishonest or selfish motive, the majority summarily adopts the hearing officer's finding of this aggravating factor despite the majority's admission that "it was not proved that Poole misappropriated funds for his own use nor falsified the invoice in an attempt to conceal funds he was wrongfully withholding." Majority at 224. The majority does not specify how Poole was benefited from his actions but merely concludes that Poole's actions were done with the intent to deceive. This finding, however, is based on the assumption that Poole did not create the May 28 invoice until October. As discussed above, this finding is not supported by a clear preponderance of the evidence, nor is the addition of this aggravating factor.

¶83 Quite simply, Poole did not need to fabricate the invoice to substantiate his claim that he notified Matson of his zero balance in May 2001 because he had a copy of the letter he sent Matson. The hearing officer found that the Bar had not met its burden in showing that the May 28, 2001, letter was created at a later time. CP at 48. The May

28 letter informed Matson that he no longer owed Poole money; in it, Poole stated, "I have now verified the work is done, I am enclosing the statement showing the credit and the balance owed is zero." Ex. 20. The May 28 invoice added nothing more to the information relayed by Poole to Matson in the letter. Because Poole had a copy of the letter and Matson testified that he received a copy of the letter as well as the invoice, it is difficult to see how Poole had a dishonest or selfish motive in creating the May 28 invoice. Rather than finding an aggravating factor, the majority should have found as a mitigating factor that Poole lacked a dishonest or selfish motive.

¶84 Turning next to Poole's mental state, the majority errs when it finds that Poole acted intentionally. The majority states that "Poole was *consciously aware* that he was providing Matson's attorney with fabricated evidence and acted with the *conscious objective or purpose* to deceive Lee and Matson as to the genuineness of the invoice." Majority at 221.[17] However, the hearing officer applied American Bar Association's *Standards for Imposing Lawyer Sanctions* standard 4.62 (1991 & Supp. 1992) (ABA *Standards*), to Poole's conduct, a standard that does not include an intent requirement, rather than relying on ABA *Standards* std. 4.61, which is applicable when an attorney acts with an intent to benefit himself or herself. Thus, it appears the hearing officer did not believe that Poole's conduct was intentional.

¶85 Additionally, in cases where we have found an attorney acted with an intentional state of mind, generally the attorney's intent was to benefit herself or himself. *See In re Disciplinary Proceeding Against VanDerbeek*, 153 Wn.2d 64, 90 n.24, 101 P.3d 88 (2004) (upholding a hearing officer's finding that an attorney acted with the intent of personal gain where the attorney engaged in false billing practices); *In re Disciplinary Proceeding Against Miller*, 149 Wn.2d 262, 281, 66 P.3d 1069 (2003) (finding that an

---

[17] A lawyer acts with intent when he or she has the "conscious objective or purpose to accomplish a particular result." ABA, STANDARDS FOR IMPOSING LAWYER SANCTIONS *Definitions* at 7 (1991 & Supp. 1992).

attorney acted with intent where he made himself the residuary beneficiary of his client's will and eliminated all of the client's bequests that would have reduced the attorney's gift); *cf. In re Disciplinary Proceeding Against Whitt*, 149 Wn.2d 707, 718, 72 P.3d 173 (2003) (finding that an attorney acted with knowledge where the attorney misled her client into believing his case was still pending when it was dismissed with prejudice, but the conduct did not benefit the attorney or the third party). As mentioned earlier, the ABA *Standards* provide that disbarment is the appropriate sanction "when a lawyer *knowingly deceives* a client *with the intent to benefit the lawyer* or another, and causes serious injury or potential serious injury to a client." ABA STANDARDS std. 4.61 (emphasis added). However, "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client." *Id.* std. 4.62. "A lawyer violates the rules with knowledge when he or she has 'the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result'." *McMullen*, 127 Wn.2d at 169 (quoting ABA STANDARDS *Definitions* at 7).

¶86 Under ABA *Standards* std. 4.61, the consideration of an attorney's intentional mental state is with respect to the attorney's "intent to benefit the lawyer or another," not the intent to deceive.[18] Unlike the attorneys in the cases cited above, Poole did not act with an intent to benefit himself when he prepared the invoice in October, whether or not he prepared one in May. Thus, at most, Poole acted with knowledge.

¶87 Our discussion in *Dynan*, 152 Wn.2d 601, is instructive. In that case, an attorney altered bills and submitted

---

[18] It is helpful to compare ABA *Standards* std. 4.61 with ABA *Standards* std. 6.11 involving false statements, fraud, and misrepresentation in violation of an attorney's duty to the legal system. ABA *Standards* std. 6.11 states: "Disbarment is generally appropriate when a lawyer, *with the intent to deceive the court*, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding." (Emphasis added.)

false declarations to the superior court in support of his motion for attorney fees. Even though Dynan submitted the altered bill to the court as evidence, this court found that Dynan acted knowingly. *Id.* at 618. Assuming that Poole produced the invoice in October 2001 and submitted it to Lee as a true copy of the May 28 invoice, then his conduct is similar to Dynan's. It is incongruent for us to assign one mental state to Dynan and another mental state to Poole: the conduct of fabricating the document is the same. Poole, like Dynan, may have had a conscious awareness that Lee would be deceived as to the authenticity of the invoice; however, Poole did not have the conscious objective to benefit himself by falsifying the invoice. If Poole fabricated the invoice, it was merely to reassure Matson that he had written off Matson's balance as of May 28, 2001.

¶88 The majority reduces the one-year suspension imposed by the Board, but it does not reduce the sanction far enough. As the majority notes, we adopt the Board's recommended sanction unless we are persuaded that the sanction is inappropriate under the *Noble* factors. *See In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983). In line with our commitment to consistency in attorney discipline, we determine whether the sanction imposed is proportionate to the sanctions in other attorney discipline cases. *Anschell*, 141 Wn.2d at 615. We seek to impose sanctions that are roughly proportionate to sanctions imposed in similar situations or for analogous levels of culpability. *In re Disciplinary Proceeding Against Gillingham*, 126 Wn.2d 454, 469, 896 P.2d 656 (1995).

¶89 The majority states that a six-month suspension is proportionate to sanctions imposed in similar situations, relying on our decision in *Dynan*. As discussed above, Dynan was sanctioned for altering and submitting false billings in support for his motion for attorney fees with attached declarations stating that the bills were true and correct billings for Dynan's time. This court found Dynan's presumptive sanction to be disbarment, which is the presumptive sanction for serious criminal conduct that in-

cludes interference with the administration of justice, false swearing, misrepresentation, or fraud. *Dynan*, 152 Wn.2d at 619-20. This court also found that "while no actual harm occurred to clients, the prospect of potential harm to the court system and opposing counsel was very high." *Id.* at 624. However, based on a proportionality review and the conclusion that Dynan lacked a selfish or dishonest motive, this court found disbarment to be an inappropriate sanction and imposed a six-month suspension.

¶90 In concluding that a suspension of six months or greater would be proportionate with the sanction imposed in *Dynan*, the majority finds that Dynan was "somewhat less culpable" than Poole. *See* majority at 228-29. It is difficult to understand how the majority reaches this conclusion, however, because unlike Dynan, Poole did not commit serious criminal conduct. Moreover, the majority identifies no evidence of harm or potential harm caused as a result of Poole's conduct. The majority's conclusion that a six-month suspension is proportionate is again based on the incorrect finding of the hearing officer that Poole demonstrated an intentional mental state, a finding not supported by a clear preponderance of the evidence, as discussed earlier. If anything, *Dynan* counsels us to impose a suspension less than six months.

¶91 Moreover, imposing a six-month suspension here is disproportionate to the sanction imposed in *Carmick*. In *Carmick*, we found a 60-day suspension an appropriate sanction where the attorney made misrepresentations to a superior court in obtaining an ex parte order and where the attorney directly contacted a party the attorney should have known was represented by counsel. *Carmick*, 146 Wn.2d at 607. The presumptive sanction for knowingly misrepresenting information to a superior court is suspension. We held that only three of the seven aggravating factors found by the disciplinary board were supported by the record. The only mitigating factor we found was delay in the disciplinary proceedings.

¶92 The majority attempts to distinguish *Carmick* based on the finding that Carmick's conduct was committed knowingly while Poole's conduct exhibited an intentional state of mind. However, as discussed above, the majority's conclusion that Poole acted with the intent to benefit himself is not supported by a clear preponderance of the evidence. Imposing a suspension of 60 days here would be roughly proportional to the sanction imposed in *Carmick*.

¶93 In addition to its proportionality analysis, the majority justifies its imposition of a six-month suspension, rather than a suspension of a lesser duration, by the ABA *Standards'* suggestion that " '[g]enerally, suspension should be for a period of time equal to or greater than six months.' " Majority at 226-27 (quoting ABA STANDARDS std. 2.3). However, we have repeatedly deviated from this guideline. *See Lopez*, 153 Wn.2d 570 (imposing a 60-day suspension where an attorney failed to file an opening brief after three extensions); *Gillingham*, 126 Wn.2d 454 (imposing a 60-day suspension where an attorney was a beneficiary in a will he drafted for a client); *In re Disciplinary Proceeding Against Johnson*, 118 Wn.2d 693, 826 P.2d 186 (1992) (imposing a 60-day suspension where an attorney engaged in business transactions with clients without making adequate written disclosures); *In re Disciplinary Proceeding Against Malone*, 107 Wn.2d 263, 728 P.2d 1029 (1986) (imposing a 60-day suspension where an attorney mishandled and misappropriated client funds).

¶94 The majority errs in its conclusion that Poole acted with intent to benefit himself, that his conduct demonstrated a dishonest or selfish motive, and that a six-month suspension is proportionate to the sanctions imposed in similar situations or for analogous levels of culpability. A six-month suspension in this case is excessive. I would

impose no more than a 60-day suspension and, therefore, respectfully dissent.

ALEXANDER, C.J., and J.M. JOHNSON, J., concur with MADSEN, J.

Reconsideration denied March 28, 2006.